2008 WY 4

**Andrew John YELLOWBEAR, Jr., Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. 06–246.

Supreme Court of Wyoming.

Jan. 14, 2008.

Representing Appellant: Sylvia Lee Hackl of Cheyenne, Wyoming.

Representing Appellee: Patrick J. Crank, Wyoming Attorney General; Terry L. Armitage, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and David L. Delicath, Senior Assistant Attorney General. Argument by Mr. Delicath.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

VOIGT, Chief Justice.

[¶1] The appellant was convicted of two counts of felony murder, and two counts of being an accessory to felony murder, all based upon the physical abuse and death of his daughter. In this appeal, he questions whether the State of Wyoming had jurisdiction to prosecute him, whether the jury was properly instructed, and whether the prosecutor committed misconduct during rebuttal closing argument. We affirm, but remand for amendment of the Judgment and Sentence.

## ISSUES

[¶2] 1. Did the crime occur in "Indian country," as that term is defined in 18 U.S.C. § 1151, thereby depriving the State of Wyoming of jurisdiction over the appellant?

2. Did the district court commit reversible error by instructing the jury as to a parent's duty to protect his or her child?

3. Did the prosecutor commit misconduct during rebuttal closing argument by inserting his own credibility and beliefs, by arguing facts not in evidence, and by presenting an argument that was not properly a rebuttal argument?

## FACTS

[¶ 3] When she died on July 2, 2004, Marcella [1] Hope Yellowbear was the twenty-two-month-old daughter of the appellant and Macalia Blackburn. Marcella lived with her parents and two siblings in Riverton, Wyoming. On the night Marcella died, the appellant telephoned the emergency room of Riverton Memorial Hospital and reported that Blackburn was bringing their daughter, who was not breathing, to the hospital. Very soon after mother and daughter arrived, hospital staff determined that the infant was deceased.

[¶ 4] Given the nature and extent of Marcella's injuries, the hospital staff suspected child abuse. An autopsy performed the following day revealed almost innumerable abrasions, wounds, burns, and broken bones. The cause of Marcella's death was determined to be "repetitive, abusive, blunt-force injuries." The manner of death was determined to be homicide.

[¶ 5] After a preliminary investigation, including interviews of Blackburn and the appellant, both were arrested and charged with felony murder. The appellant eventually was convicted of two counts of felony murder and two counts of accessory before the fact to felony murder. He was tried on four counts, rather than one, as a result of a series of defense motions and court rulings that will be discussed *infra*. The State sought the death penalty, but the appellant was sentenced to life in prison without the possibility of parole. Blackburn entered into a plea agreement with the State whereby she pled guilty to an amended count of accessory before the fact to second-degree murder in

violation of Wyo. Stat. Ann. §§ 6–1–201(a) and 6–2–104 (LexisNexis 2007), and whereby she agreed to testify in the appellant's case.

## DISCUSSION

*Did the crime occur in "Indian country," as that term is defined in 18 U.S.C. § 1151, thereby depriving the State of Wyoming of jurisdiction over the appellant?*

[¶ 6] The question of subject matter jurisdiction is a question of law that we review *de novo*. *Messer v. State*, 2004 WY 98, ¶ 8, 96 P.3d 12, 15 (Wyo.2004). The specific question of whether the scene of the crime in this case was under the jurisdiction of the United States or the jurisdiction of the State of Wyoming is also a question of law to be reviewed *de novo*. *State v. Moss*, 471 P.2d 333, 334 (Wyo.1970).

[¶ 7] The Wind River Indian Reservation lies in north-central Wyoming. The Reservation was established by a treaty between the United States and the Shoshone and Bannock Tribes, concluded in 1868 and ratified in 1869. 15 Stat. 673 (July 3, 1868). Today, the Reservation is inhabited by the Eastern Shoshone and Northern Arapaho Tribes. The appellant and Blackburn are both enrolled members of the Northern Arapaho Tribe, as was their daughter Marcella.

[¶ 8] Marcella was killed in Riverton, Wyoming. The City of Riverton lies within the original external boundaries of the Reservation. The question before the Court is whether the place Marcella was killed remains "Indian country," and therefore subject to federal jurisdiction, or whether the Reservation has been "diminished" since the treaty, so as to allow the exercise of Wyoming state court jurisdiction. Resolution of that issue requires a review of the post-treaty history of the Reservation, as well as review of the federal jurisprudence that has developed concerning federal and state jurisdiction in "diminished" reservations. *Seymour v. Superintendent of Washington State*

---

1. The victim's name is spelled alternatively as "Marcela" and "Marcella" throughout the record. We will refer to her as "Marcella," as that spelling seems to predominate.

*Penitentiary,* 368 U.S. 351, 353, 82 S.Ct. 424, 426, 7 L.Ed.2d 346 (1962).

[¶ 9] The question of jurisdiction for the prosecution of criminal offenses on Indian reservations arose in *Ex parte Crow Dog,* 109 U.S. 556, 3 S.Ct. 396, 27 L.Ed. 1030 (1883), *overruled in part on other grounds by State v. Hazlett,* 16 N.D. 426, 113 N.W. 374 (N.D. 1907). The United States Supreme Court held that the federal courts did not have jurisdiction to prosecute a murder occurring in Indian country. *Id.,* 109 U.S. at 572, 3 S.Ct. at 407. Congress responded by passing the Indian Major Crimes Act, 18 U.S.C. § 1151 *et seq.,* granting the United States exclusive jurisdiction to prosecute Indians for major crimes in "Indian country." *See United States v. Kagama,* 118 U.S. 375, 383, 6 S.Ct. 1109, 1113, 30 L.Ed. 228 (1886); *Keeble v. United States,* 412 U.S. 205, 209, 93 S.Ct. 1993, 1996, 36 L.Ed.2d 844 (1973).

[¶ 10] 18 U.S.C. § 1152 (2000) provides in pertinent part that "[e]xcept as otherwise expressly provided by law, the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to the Indian country." In turn, 18 U.S.C. § 1151 (2000) defines the term "Indian country" as it relates to the present controversy as follows:

(a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation.

[¶ 11] As the people of the United States moved ever-westward across the continent, increasing numbers of native tribes were displaced from their ancestral grounds in the early to mid-nineteenth century and eventually were "settled" on reservations. Population increases and westward movement continued, however, and by the late nineteenth century, the federal government changed its policies toward the tribes and toward reservations. The General Allotment Act of 1887 permitted the federal government to allot tracts of reservation land to individual tribal members and, with tribal consent, to sell the surplus lands to non-Indian settlers. Act of Feb. 8, 1887, ch. 119, 24 Stat. 388 (1887). This policy reflected a broader attitudinal change:

Within a generation or two, it was thought, the tribes would dissolve, their reservations would disappear, and individual Indians would be absorbed into the larger community of white settlers. See Hearings on H.R. 7902 before the House Committee on Indian Affairs, 73d Cong., 2d Sess., 428 (1934) (statement of D.S. Otis on the history of the allotment policy).

*South Dakota v. Yankton Sioux Tribe,* 522 U.S. 329, 335, 118 S.Ct. 789, 794, 139 L.Ed.2d 773 (1998).

[¶ 12] Developments on the Wind River Indian Reservation followed the national pattern. Article 11 of the 1868 treaty had provided as follows:

No treaty for the cession of any portion of the reservations herein described which may be held in common shall be of any force or validity as against the said Indians, unless executed and signed by at least a majority of all the adult male Indians occupying or interested in the same; and no cession by the tribe shall be understood or construed in such manner as to deprive without his consent, any individual member of the tribe of his right to any tract of land selected by him, as provided in Article 6 of this treaty.

[¶ 13] In 1904, James McLaughlin, United States Indian Inspector for the Reservation, negotiated a new treaty with the Shoshone and Arapaho Tribes. That treaty was ratified, as amended, by the Surplus Land Act of 1905, ch. 1452, 33 Stat. 1016 (1905). Because it is the focus of this controversy, we will set it forth in its entirety as it was ratified:

ARTICLE I. The said Indians belonging on the Shoshone or Wind River Reservation, Wyoming, for the consideration hereinafter named, ***do hereby cede, grant, and relinquish to the United States, all right, title, and interest which they may have*** to all the lands embraced within the said reservation, except the lands within and bounded by the following described lines:

Beginning in the midchannel of the Big Wind River at a point where said stream crosses the western boundary of the said reservation; thence in a southeasterly direction following the midchannel of the Big Wind River to its conjunction with the Little Wind or Big Popo–Agie River, near the northeast corner of township one south, range four east; thence up the midchannel of the said Big Popo–Agie River in a southwesterly direction to the mouth of the North Fork of the said Big Popo–Agie River to its intersection with the southern boundary of the said reservation, near the southwest corner of section twenty-one, township two south, range one west; thence due west along the said southern boundary of the said reservation to the southwest corner of the same; thence north along the western boundary of said reservation to the place of beginning: *Provided,* That any individual Indian, a member of the Shoshone or Arapahoe tribes, who has, under existing laws or treaty stipulations, selected a tract of land within the portion of said reservation hereby ceded, shall be entitled to have the same allotted and confirmed to him or her, and any Indian who has made or received an allotment of land within the ceded territory shall have the right to surrender such allotment and select other lands within the *diminished reserve* in lieu thereof at any time before the lands hereby ceded shall be opened for entry.

ARTICLE II. In consideration of the lands *ceded, granted, relinquished, and conveyed* by Article I of this agreement, the United States stipulates and agrees to dispose of the same, as hereinafter provided, under the provisions of the homestead, town-site, coal and mineral land laws, or by sale for cash, as hereinafter provided, at the following prices per acre: All lands entered under the homestead law within two years after the same shall be opened for entry shall be paid for at the rate of one dollar and fifty cents per acre; after the expiration of this period, two years, all lands entered under the homestead law within three years therefrom shall be paid for at the rate of one dollar and twenty-five cents per acre; that all homestead

entrymen who shall make entry of the lands herein ceded within two years after the opening of the same to entry shall pay one dollar and fifty cents per acre for the land embraced in their entry, and for all of the said lands thereafter entered under the homestead law the sum of one dollar and twenty-five cents per acre shall be paid; payment in all cases to be made as follows: Fifty cents per acre at the time of making entry and twenty-five cents per acre each year thereafter until the price per acre hereinbefore provided shall have been fully paid; that lands entered under the town-site, coal and mineral land laws shall be paid for in an amount and manner as provided by said laws; and in case any entryman fails to make the payments herein provided for, or any of them, within the time stated, all rights of the said entryman to the lands covered by his or her entry shall at once cease and any payments therebefore made shall be forfeited and the entry shall be held for cancellation and canceled, and all lands, except mineral and coal lands herein ceded, remaining undisposed of at the expiration of five years from the opening of said lands to entry shall be sold to the highest bidder for cash, at not less than one dollar per acre, under rules and regulations to be prescribed by the Secretary of the Interior; *And provided,* That nothing herein contained shall impair the rights under the lease to Asmus Boysen, which has been approved by the Secretary of the Interior; but said lessee shall have for thirty days from the date of the approval of the surveys of said land a preferential right to locate, following the Government surveys, not to exceed six hundred and forty acres in the form of a square, of mineral or coal lands in said reservation; that said Boysen at the time of entry of such lands shall pay cash therefore at the rate of ten dollars per acre and surrender said lease and the same shall be canceled; *Provided further,* That any lands remaining unsold eight years after the said lands shall have been opened to entry may be sold to the highest bidder for cash without regard to the above minimum limit of price; that lands disposed of under the town-site, coal and mineral land laws

shall be paid for at the prices provided for by law, and the United States agrees to pay the said Indians the proceeds derived from the sales of said lands, the amount so realized to be paid to and expended for said Indians in the manner hereinafter provided.

ARTICLE III. It is further agreed that of the amount to be derived from the sale of said lands, as stipulated in Article II of this agreement, the sum of eighty-five thousand dollars shall be devoted to making a per capita payment to the said Indians of fifty dollars each in cash within sixty days after the opening of the ceded lands to settlement, or as soon thereafter as such sum shall be available; *And provided further*, That upon the completion of the said fifty dollars per capita payment any balance remaining in the said fund of eighty-five thousand dollars shall at once become available and shall be devoted to surveying, platting, making of maps, payment of the fees, and the performance of such acts as are required by the statutes of the State of Wyoming in securing water rights from said State for the irrigation of such lands as shall remain the property of said Indians, whether located within the territory intended to be ceded by this agreement or within the *diminished reserve.*

ARTICLE IV. It is further agreed that of the moneys derived from the sale of said lands the sum of one hundred and fifty thousand dollars, or so much thereof as may be necessary, shall be expended under the direction of the Secretary of the Interior for the construction and extension of an irrigation system within the *diminished reservation* for the irrigation of the lands of the said Indians; *Provided,* That in the employment of persons for the construction, enlargement, repair and management of such irrigation system, members of the said Shoshone and Arapahoe tribes shall be employed wherever practicable.

ARTICLE V. It is agreed that at least fifty thousand dollars of the moneys derived from the sale of the ceded lands shall be expended, under the direction of the Secretary of the Interior, in the purchase of live stock for issue to said Indians, to be distributed as equally as possible among the men, women and children of the Shoshone or Wind River Reservation.

ARTICLE VI. It is further agreed that the sum of fifty thousand dollars of the moneys derived from the sales of said ceded lands shall be set aside as a school fund, the principal and interest on which at four per centum per annum shall be expended under the direction of the Secretary of the Interior for the erection of school buildings and maintenance of schools on the *diminished reservation,* which schools shall be under the supervision and control of the Secretary of the Interior.

ARTICLE VII. It is further agreed that all the moneys received in payment for the lands hereby ceded and relinquished, not set aside as required for the various specific purposes and uses herein provided for, shall constitute a general welfare and improvement fund, the interest on which at four per centum per annum shall be annually expended under the direction of the Secretary of the Interior for the benefit of the said Indians; the same to be expended for such purposes and in the purchase of such articles as the Indians in council may decide upon and the Secretary of the Interior approve; *Provided, however,* That a reasonable amount of the principal of said fund may also be expended each year for the erection, repair and maintenance of bridges needed on the reservation, in the subsistence of indigent and infirm persons belonging on the reservation, or for such other purposes for the comfort, benefit, improvement, or education of said Indians as the Indians in council may direct and the Secretary of the Interior approve. And it is further agreed that an accounting shall be made to said Indians in the month of July in each year until the lands are fully paid for, and the funds hereinbefore referred to shall, for the period of ten years after the opening of the lands herein ceded to settlement, be used in the manner and for the purposes herein provided, and the future disposition of the balance of said funds remaining on hand shall then be the subject of further agreement between the United States and the said Indians.

ARTICLE VIII. It is further agreed that the proceeds received from the sales of said lands, in conformity with the provisions of this agreement, shall be paid into the Treasury of the United States and paid to the Indians belonging on the Shoshone or Wind River Reservation, or expended on their account only as provided in this agreement.

ARTICLE IX. It is understood that nothing in this agreement contained shall in any manner bind the United States to purchase any portion of the lands herein described or to dispose of said lands except as provided herein, or to guarantee to find purchasers for said lands or any portion thereof, it being the understanding that the United States shall act as trustee for said Indians to dispose of said lands and to expend for said Indians and pay over to them the proceeds received from the sale thereof only as received, as herein provided.

SEC. 2 That the lands ceded to the United States under the said agreement shall be disposed of under the provisions of the homestead, town-site, coal and mineral land laws of the United States and shall be opened to settlement and entry by proclamation of the President of the United States on June fifteenth, nineteen hundred and six, which proclamation shall prescribe the manner in which these lands may be settled upon, occupied, and entered by persons entitled to make entry thereof, and no person shall be permitted to settle upon, occupy, and enter said lands except as prescribed in said proclamation until after the expiration of sixty days from the time when the same are opened to settlement and entry, and the rights of honorably discharged Union soldiers and sailors of the late civil and of the Spanish wars, as defined and described in sections twenty-three hundred and four and twenty-three hundred and five of the Revised Statutes of the United States, as amended by the Act of March first, nineteen hundred and one, shall not be abridged.

All homestead entrymen who shall make entry of the lands herein ceded within two years after the opening of the same to entry shall pay one dollar and fifty cents per acre for the land embraced in their entry, and for all of the said lands thereafter entered under the homestead law the sum of one dollar and twenty-five cents per acre shall be paid, payment in all cases to be made as follows: Fifty cents per acre at the time of making entry and twenty-five cents per acre each year thereafter until the price per acre hereinbefore provided shall have been fully paid. Upon all entries the usual fees and commissions shall be paid as provided for in homestead entries on lands the price of which is one dollar and twenty-five cents per acre. Lands entered under the town-site, coal, and mineral land laws shall be paid for in amount and manner as provided by said laws. Notice of location of all mineral entries shall be filed in the local land office of the district in which the lands covered by the location are situated, and unless entry and payment shall be made within three years from the date of location all rights thereunder shall cease; and in case any entryman fails to make the payments herein provided for, or any of them, within the time stated, all rights of the said entryman to the lands covered by his or her entry shall cease, and any payments therebefore made shall be forfeited, and the entry shall be held for cancellation and canceled; that nothing in this Act shall prevent homestead settlers from commuting their entries under section twenty-three hundred and one of the Revised Statutes of the United States by paying for the land entered the price fixed herein; that all lands, except mineral and coal lands, herein ceded remaining undisposed of at the expiration of five years from the opening of said lands to entry shall be sold to the highest bidder for cash at not less than one dollar per acre under rules and regulations to be prescribed by the Secretary of the Interior; *Provided,* That any lands remaining unsold eight years after the said lands shall have been opened to entry may be sold to the highest bidder for cash without regard to the above minimum limit of price.

SEC. 3. That there is hereby appropriated, out of any money in the Treasury of

the United States not otherwise appropriated, the sum of eighty-five thousand dollars to make the per capita payment provided in article three of the agreement herein ratified, the same to be reimbursed from the first money received from the sale of the lands herein ceded and relinquished. And the sum of thirty-five thousand dollars, or so much thereof as may be necessary, is hereby appropriated, out of any money in the Treasury of the United States not otherwise appropriated, the same to be reimbursed from the proceeds of the sale of said lands, for the survey and field and office examination of the unsurveyed portion of the ceded lands, and the survey and marking of the outboundaries of the *diminished reservation,* where the same is not a natural water boundary; and the sum of twenty-five thousand dollars is hereby appropriated out of any money in the Treasury of the United States not otherwise appropriated, the same to be reimbursed from the proceeds of the sale of said lands, to be used in the construction and extension of an irrigation system on the *diminished reservation,* as provided in article four of the agreement.

ARTICLE X. It is further understood that nothing in this agreement shall be construed to deprive the said Indians of the Shoshone or Wind River Reservation, Wyoming, of any benefits to which they are entitled under existing treaties or agreements, not inconsistent with the provisions of this agreement.

ARTICLE XI. This agreement shall take effect and be in force when signed by U.S. Indian Inspector James McLaughlin and by a majority of the male adult Indians parties hereto, and when accepted and ratified by the Congress of the United States.

(Emphasis added in bold italics.) It is uncontested that the City of Riverton lies north of the Big Wind River on land that was ceded in the 1905 Act.

[¶ 14] The pivotal question in cases such as this is whether the federal government or the state government has jurisdiction to prosecute the criminal offense. In a long series of cases, the United States Supreme Court has fashioned a process for determining whether a surplus land act intended to diminish a reservation or simply intended to allow non-Indians to settle within an established reservation. In the former situation, the state government gains jurisdiction in the ceded area, while in the latter situation, jurisdiction remains with the federal government. Our task now is to determine what intent the 1905 Act quoted above had as to the ceded lands of the Wind River Indian Reservation. A review of Supreme Court precedent will place our case in perspective and help answer that question.

[¶ 15] The Colville Indian Reservation in Washington, created in 1872, was diminished by an act of Congress in 1892, providing that the northern half of the reservation would be "vacated and restored to the public domain." In 1906, a subsequent act of Congress allotted a parcel of the diminished reservation to each member of the Colville tribe, and opened the remainder of the diminished reservation for settlement under the homestead laws. *Seymour,* 368 U.S. at 354–55, 82 S.Ct. at 426–27. Years later, a tribal member, Paul Seymour, was convicted in state court of an attempted burglary that occurred on unallotted land in the diminished area of the reservation. *Id.,* 368 U.S. at 352, 82 S.Ct. at 425. In federal habeas corpus proceedings, the Supreme Court looked to the definition of "Indian country" found in 18 U.S.C. § 1151, and found that the 1906 Act did not dissolve the reservation because, unlike the 1892 Act, it did not expressly vacate the land and restore it to the public domain. Rather, the Court concluded that the Act "did no more than open the way for non-Indian settlers to own land on the reservation in a manner which the Federal Government, acting as guardian and trustee for the Indians, regarded as beneficial to the development of its wards." *Id.,* 368 U.S. at 356, 82 S.Ct. at 427.

[¶ 16] An 1891 executive order expanded the Hoopa Valley Reservation in California to include the previously established Klamath River Reservation. *Mattz v. Arnett,* 412 U.S. 481, 493, 93 S.Ct. 2245, 2252, 37 L.Ed.2d 92 (1973). A year later, Congress opened the land that had been the Klamath River Reservation to settlement. *Id.,* 412 U.S. at 494–95, 93 S.Ct. at 2253. The Act of 1892 also

allowed tribal members to receive individual allotments of land, and it provided that the federal government would use the land sale proceeds for the "maintenance and education" of the tribal members. *Id.*, 412 U.S. at 495, 93 S.Ct. at 2253. This case arose when Raymond Mattz, a member of the Klamath tribe, was prosecuted by the State of California for a fishing violation that occurred on unallotted land in what had been the Klamath River Reservation. Mattz defended on the ground that the area was "Indian country" over which the state had no jurisdiction. *Id.*, 412 U.S. at 484, 93 S.Ct. at 2248. Relying once again on the definition of "Indian country" found in 18 U.S.C. § 1151, the Supreme Court determined that the 1892 Act did not terminate the reservation because it did not do so expressly on its face, and such intent was not clear from the surrounding circumstances or legislative history. *Id.*, 412 U.S. at 505, 93 S.Ct. at 2258. Consequently, the land remained "Indian country."

[¶ 17] Two years after *Mattz*, the Supreme Court examined very different legislative language in *DeCoteau v. District County Court*, 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975). The Lake Traverse Indian Reservation was created in present-day South Dakota in 1867 by a treaty between the United States and the Sisseton–Wahpeton tribe. *Id.*, 420 U.S. at 426, 95 S.Ct. at 1084. In 1891, Congress ratified a treaty whereby the tribe agreed to "cede, sell, relinquish, and convey to the United States all the unallotted land within the reservation remaining after the allotments[,]" in exchange for $2.50 per acre ceded. *Id.*, 420 U.S. at 436–37, 95 S.Ct. at 1088–89. When state authorities removed Cheryl DeCoteau's children from her home for alleged neglect, the subsequent habeas corpus proceedings once again raised the jurisdictional issue. In *DeCoteau*, the Supreme Court distinguished *Seymour* and *Mattz*, found that the treaty at issue was a negotiated agreement providing a sum certain payment, and found that its language was "precisely suited" to disestablishment. *Id.*, 420 U.S. at 447–48, 95 S.Ct. at 1094–95. In reaching that conclusion, the Supreme Court found the treaty's language comparable to the following language from other agreements:

"cede, relinquish, and forever and absolutely surrender to the United States all their claim, title and interest of every kind and character...."

"cede, relinquish and surrender, forever and absolutely, to the United States, all their claim, title and interest of every kind and character...."

"cede, convey, transfer, relinquish, and surrender forever and absolutely, without any reservation whatever, express or implied, all their claim, title, and interest of every kind and character...."

"cede, grant, relinquish, and quitclaim to the United States all right, title, and claim which they now have, or ever had...."

....

"cede, sell, and relinquish to the United States all their right, title, and interest...."

"agree to dispose of and sell to the Government of the United States, for certain considerations hereinafter mentioned...."

*Id.*, 420 U.S. at 439 n. 22, 95 S.Ct. at 1090 n. 22.

[¶ 18] The Rosebud Reservation was created in South Dakota in 1889. *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 589, 97 S.Ct. 1361, 1364, 51 L.Ed.2d 660 (1977). In 1904, Congress ratified a treaty under which the tribe would "cede, surrender, grant, and convey to the United States all their claim, right, title, and interest in and to" a specified portion of the reservation. *Id.*, 430 U.S. at 597, 97 S.Ct. at 1368. The United States opened the ceded lands to settlement, and acted as trustee for the tribe in selling those lands, but did not guarantee that it would find buyers, or promise that the tribe would receive a specific amount of compensation in return. *Id.*, 430 U.S. at 596, 97 S.Ct. at 1368. In 1972, the Rosebud Sioux tribe brought a federal action seeking a declaratory judgment that the 1904 Act had not diminished the reservation. The Supreme Court, however, found the Act's language, like that in *DeCoteau*, to be " 'precisely suited' to disestablishment," and concluded that the land was no longer "Indian country." *Id.*, 430 U.S. at 597, 97 S.Ct. at 1368. In addition, the Court noted that the lack of a "sum

certain" payment was just one of multiple factors to be considered in determining the intent of the Act, with another of those factors being the "longstanding assumption of jurisdiction by the State over an area that is over 90% non-Indian both in population and in land use...." *Id.*, 430 U.S. at 598 n. 20, 603–05, 97 S.Ct. at 1369 n. 20, 1371–72.

[¶ 19] Finally, in *Solem v. Bartlett*, 465 U.S. 463, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984), the Supreme Court explained in detail the appropriate method for determining whether ceded reservation land ceases to be "Indian country." The Cheyenne River Sioux Reservation was created in 1889. In 1908, Congress opened part of the reservation to settlement, with the operative language of the Act authorizing the Secretary of the Interior to "sell and dispose of" certain lands, and providing that the proceeds from such sales would be deposited in the United States Treasury to the credit of the tribe. *Id.*, 465 U.S. at 472–73, 104 S.Ct. at 1167. Later, John Bartlett was convicted in state court of attempted rape and he challenged state jurisdiction in a federal habeas corpus petition, alleging that the crime occurred in "Indian country." *Id.*, 465 U.S. at 465, 104 S.Ct. at 1163. The Court's recitation of the proper analysis of the jurisdictional issue was as follows:

Our precedents in the area have established a fairly clean analytical structure for distinguishing those surplus land Acts that diminished reservations from those Acts that simply offered non-Indians the opportunity to purchase land within established reservation boundaries. The first and governing principle is that only Congress can divest a reservation of its land and diminish its boundaries. Once a block of land is set aside for an Indian Reservation and no matter what happens to the title of individual plots within the area, the entire block retains its reservation status until Congress explicitly indicates otherwise.

Diminishment, moreover, will not be lightly inferred. Our analysis of surplus land Acts requires that Congress clearly evince an "intent ... to change ... boundaries" before diminishment will be found. The most probative evidence of congressional intent is the statutory language used to open the Indian lands. Explicit reference to cession or other language evidencing the present and total surrender of all tribal interests strongly suggests that Congress meant to divest from the reservation all unalloted opened lands. When such language of cession is buttressed by an unconditional commitment from Congress to compensate the Indian tribe for its opened land, there is an almost insurmountable presumption that Congress meant for the tribe's reservation to be diminished.

As our opinion in *Rosebud Sioux Tribe* demonstrates, however, explicit language of cession and unconditional compensation are not prerequisites for a finding of diminishment. When events surrounding the passage of a surplus land Act—particularly the manner in which the transaction was negotiated with the tribes involved and the tenor of Legislative Reports presented to Congress—unequivocally reveal a widely held, contemporaneous understanding that the affected reservation would shrink as a result of the proposed legislation, we have been willing to infer that Congress shared the understanding that its action would diminish the reservation, notwithstanding the presence of statutory language that would otherwise suggest reservation boundaries remained unchanged. To a lesser extent, we have also looked to events that occurred after the passage of a surplus land Act to decipher Congress' intentions. Congress' own treatment of the affected areas, particularly in the years immediately following the opening, has some evidentiary value, as does the manner in which the Bureau of Indian Affairs and local judicial authorities dealt with unalloted open lands.

On a more pragmatic level, we have recognized that who actually moved onto opened reservation lands is also relevant to deciding whether a surplus land Act diminished a reservation. Where non-Indian settlers flooded into the opened portion of a reservation and the area has long since lost its Indian character, we have acknowl-

edged that *de facto,* if not *de jure,* diminishment may have occurred. In addition to the obvious practical advantages of acquiescing to *de facto* diminishment, we look to the subsequent demographic history of opened lands as one additional clue as to what Congress expected would happen once land on a particular reservation was opened to non-Indian settlers.

There are, of course, limits to how far we will go to decipher Congress' intention in any particular surplus land Act. When both an Act and its legislative history fail to provide substantial and compelling evidence of a congressional intention to diminish Indian lands, we are bound by our traditional solicitude for the Indian tribes to rule that diminishment did not take place and that the old reservation boundaries survived the opening.

*Id.,* 465 U.S. at 470–72, 104 S.Ct. at 1166–67 (internal citations and footnotes omitted).

[¶ 20] In applying this standard to the facts in *Solem,* the Supreme Court first found that the "sell and dispose" language in the 1908 Act, along with the simple provision that sale proceeds be deposited in the federal treasury, did not show congressional intent to disestablish the reservation, but showed only that Congress was allowing non-Indian settlers to own land on the reservation. *Id.,* 465 U.S. at 473, 104 S.Ct. at 1167. Further, the Court noted that the Act made no specific reference to cession of the land or any change in the reservation's boundaries. *Id.,* 465 U.S. at 474, 104 S.Ct. at 1168. In looking at the events surrounding passage of the act, the Court noted that the Act did not begin with an agreement between the United States and the tribes, and that the tribes clearly opposed the Act. *Id.,* 465 U.S. at 476–77, 104 S.Ct. at 1169–70. Significantly, in comparison to the situation on the Wind River Indian Reservation, most of the tribe obtained allotments and two-thirds of the tribe lived on the opened lands, strong tribal presence (including the seat of government) remained in the opened lands, and white settlement had failed. *Id.,* 465 U.S. at 480, 104 S.Ct. at 1171. Finally, the Court found the history of events occurring after passage of the Act so contradictory as to be of little

evidentiary value. *Id.,* 465 U.S. at 478–79, 104 S.Ct. at 1170. In the end, the Court found "it is impossible to say that the opened areas of the Cheyenne River Sioux Reservation have lost their Indian character." *Id.,* 465 U.S. at 480, 104 S.Ct. at 1171.

[¶ 21] Ten years after *Solem,* the Supreme Court again used its analytical approach in *Hagen v. Utah,* 510 U.S. 399, 114 S.Ct. 958, 127 L.Ed.2d 252 (1994). The Uintah Valley Reservation in Utah was established by Congress in 1864. *Id.,* 510 U.S. at 402, 114 S.Ct. at 961. A congressional act of 1902 provided that if a majority of adult male tribal members agreed, lands within the reservation would be allotted to tribal members, with the remaining lands to be restored to the public domain and opened for settlement. Proceeds from the land sales were to be used for the benefit of the tribes, and about $70,000 was appropriated for direct payment to the tribe after its approval of the agreement. *Id.,* 510 U.S. at 403 n. 1, 114 S.Ct. at 961 n. 1. Subsequently, Congress set aside sufficient land for the grazing needs of tribal members remaining on the reservation, and clarified that the $70,000 appropriation was to be paid without waiting for tribal approval of the allotment and cession process. *Id.,* 510 U.S. at 404, 114 S.Ct. at 962. Later still, Congress directed the Secretary of the Interior to allot the reservation with or without tribal consent, and in 1905 a presidential proclamation opened unallotted lands and restored them to the public domain. *Id.,* 510 U.S. at 407, 114 S.Ct. at 963.

[¶ 22] Robert Hagen, a member of the Uintah tribe, pled guilty in state court to a controlled substance violation that occurred in Myton, Utah, which lies within the area opened for settlement by the presidential proclamation. Hagen later sought to withdraw his plea on the ground that the state court lacked jurisdiction of "Indian country." *Id.,* 510 U.S. at 408, 114 S.Ct. at 964. The case eventually reached the United States Supreme Court. In determining whether the opened lands were still "Indian country," the Court looked first to the language of the 1902 Act and held that "restoration of unalloted reservation lands to the public domain evidences a congressional intent with respect to

those lands inconsistent with continuation of reservation status." *Id.*, 510 U.S. at 414, 114 S.Ct. at 967. The Court also concluded that contemporary evidence, including the language of the presidential proclamation, demonstrated an understanding that the reservation would be diminished with or without the tribe's consent. *Id.*, 510 U.S. at 416–20, 114 S.Ct. at 968–70. Although the Court did note that subsequent events were "less illuminating" as to congressional intent, it did note the following factors that suggested the reservation had been diminished and that the opened lands no longer were "Indian country": (1) the current population of the opened lands was about 85% non-Indian; (2) the population of the largest city in the area was about 93% non-Indian; (3) the seat of tribal government was not in the opened lands; and (4) the State of Utah had exercised jurisdiction over the area in question since the lands were opened. *Id.*, 510 U.S. at 420–21, 114 S.Ct. at 970.

[¶ 23] The *Solem* factors again were applied to resolve a similar issue in *South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 118 S.Ct. 789, 139 L.Ed.2d 773 (1998). The Yankton Sioux Reservation was established by treaty in 1858. *Id.*, 522 U.S. at 333, 118 S.Ct. at 793. In an 1892 treaty, the tribe agreed to "cede, sell, relinquish, and convey to the United States" all of its unallotted lands for $600,000. *Id.*, 522 U.S. at 336–38, 118 S.Ct. at 795. The treaty was ratified by Congress in 1894 and non-Indian settlers soon acquired the ceded lands. *Id.*, 522 U.S. at 339, 118 S.Ct. at 796. The 1998 case began when state authorities attempted to apply state environmental regulations to a solid waste disposal facility on the ceded lands. The tribe sought a declaratory judgment that the facility was located on land that remained "Indian country." *Id.*, 522 U.S. at 340–41, 118 S.Ct. at 796. The United States Supreme Court disagreed with the tribe, holding that the plain language of the 1894 Act clearly demonstrated congressional intent to diminish the reservation. Citing *DeCoteau*, the Court held that the phrase "cede, sell, relinquish, and convey," along with the sum-certain payment of $600,000, was "precisely suited" to diminishing the reservation. *Id.*, 522 U.S. at 344, 118 S.Ct. at

798. Further, the Court found nothing in the events surrounding passage of the Act that could overcome the strong presumption of diminishment arising from the plain language of the Act. *Id.*, 522 U.S. at 351–54, 118 S.Ct. at 802–03. The Court concluded by noting that, while current status of ceded lands is the least compelling factor in determining congressional intent, the population of the ceded area was over two-thirds non-Indian, and municipalities had been incorporated under state law within the ceded lands, both of which factors signified a diminished reservation. *Id.*, 522 U.S. at 356–57, 118 S.Ct. at 804–05.

[¶ 24] When we apply the United States Supreme Court's analytical construct to the 1905 Act that ratified the 1904 Wind River Indian Reservation Agreement, we cannot help but conclude that Congress intended a diminished reservation, with the ceded lands losing their status as "Indian country." We begin by looking at the language of the Act itself. Clearly, the words "do hereby cede, grant, and relinquish to the United States, all right, title, and interest which they may have" are indistinguishable from the language of *DeCoteau*, 420 U.S. at 445, 95 S.Ct. at 1093. Beyond that, the phrases "diminished reserve" or "diminished reservation" appear six times in the Act, and $35,000 is appropriated to survey the "outboundaries of the diminished reservation," which survey would not seem necessary absent diminishment.

[¶ 25] The government's payment obligations under the Act, although perhaps not so clearly as the language mentioned above, also point toward the intention of a diminished reservation. While some of the payments, such as those for schools, and for the tribes' "welfare and improvement," were to be made out of sales proceeds, indicating that they were not necessarily a "sum certain," the Act also appropriated specific amounts for certain payments, including $85,000 for per capita payments, $35,000 for surveying, and $25,000 for an irrigation system "on the diminished reservation."

[¶ 26] The next inquiry in the *Solem* analysis is the question of whether events and

circumstances surrounding passage of the Act reflect one way or the other upon congressional intent regarding diminishment. Those events and circumstances pertaining to the 1905 Act were set forth and examined in great detail in *In re General Adjudication of All Rights to Use Water in the Big Horn River System*, 753 P.2d 76, 119–35 (Wyo. 1988) (Thomas, J., dissenting), *judgment aff'd sub nom. Wyoming v. United States*, 492 U.S. 406, 109 S.Ct. 2994, 106 L.Ed.2d 342 (1989), *overruled on other grounds by Vaughn v. State*, 962 P.2d 149 (Wyo.1998), and we will not attempt here to recreate that exhaustive treatment. Suffice it to say that, while they disagreed over whether reserved water rights continued to exist in the ceded lands, the majority and dissent in *Big Horn River* agreed that the reservation had been diminished. *Id.*, 753 P.2d at 84, 112, 114, 119–35.

[¶ 27] In 1960, Chief Justice Blume, writing for a unanimous court in *Blackburn v. State*, 357 P.2d 174, 176–78 (Wyo.1960), concluded that certain lands located within the Riverton Reclamation Project a few miles north of Riverton in the ceded area, were no longer "Indian country" under 18 U.S.C. § 1151. The fact that the crime scene in *Blackburn* was not located within the City of Riverton, and the fact that subsequent acts of Congress were considered by the Court in determining congressional intent, prevent it from compelling a particular result in the instant case. Nevertheless, Chief Justice Blume's analysis suggests that the result would have been the same, had only the 1905 Act been considered. *Blackburn*, 357 P.2d at 179; *Big Horn River*, 753 P.2d at 121 (Thomas, J., dissenting).

[¶ 28] The issue of state court versus federal court jurisdiction in former "Indian country" arose directly in *State v. Moss*, 471 P.2d 333 (Wyo.1970). Moss, a Northern Arapaho, killed a woman within the City of Riverton on land that once had been part of an allotment held by an Indian. At the time of the murder, however, the land was owned by a non-Indian and had been annexed into the City of Riverton. *Id.* at 334. The state trial court had held that it lacked jurisdiction to hear the murder case because the land

was "Indian country." After reviewing the 1905 Act, similar acts, and pertinent United States Supreme Court precedent, we concluded that Congress had placed the ceded land outside the reservation and it was no longer "Indian country." *Id.* at 339. The facts in *Moss* are nearly identical to those in the instant case, and we would be hard-pressed to reach a different conclusion.

[¶ 29] Finally, *Solem* directs us to examine events subsequent to passage of the Act that may shed light upon its intent. In that regard, the record evidence in the instant case is notably similar to the evidence in *Yankton Sioux*, 522 U.S. at 356–57, 118 S.Ct. at 804–05, and in *Hagen*, 510 U.S. at 420–21, 114 S.Ct. at 970, where the Supreme Court found intent to diminish the reservation: (1) the seat of tribal government on the Wind River Indian Reservation is not within the ceded lands; (2) about 92% of the population of the City of Riverton is non-Indian; and (3) the City of Riverton and State of Wyoming provide sanitation, street maintenance, water and sewer service, planning and zoning, and law enforcement.

[¶ 30] In addition to these demographic factors, certain events subsequent to the 1905 Act also indicate that the reservation was diminished. In 1907, for instance, Congress passed an act in which it referred to the ceded portion of the reservation as "lands formerly embraced in the Wind River or Shoshone Indian Reservation." Act of Jan. 17, 1907, ch. 151, 34 Stat. 849 (1907). In the 1930's, the Shoshone tribe sued the United States for placing the Northern Arapaho tribe on the reservation without the Shoshone's permission. *Shoshone Tribe of Indians of Wind River Reservation in Wyoming v. United States*, 82 Ct.Cl. 23 (1935), *remanded on other grounds*, 299 U.S. 476, 57 S.Ct. 244, 81 L.Ed. 360 (1937). In its decision in that case, the Court of Claims referred to the portion of the reservation that had not been ceded as the "diminished reservation." *Id.* at 23. Included with the decision was a map that identified the area north of the Big Wind River as "ceded by agreement of April 21, 1904," and identified the area south of the Big Wind River as the "present Wind River or Shoshone Indian Reservation." *Id.* at 30.

In deciding cross-petitions for *certiorari,* the United States Supreme Court used the term "diminished reservation." *Shoshone Tribe of Indians of Wind River Reservation in Wyoming v. United States,* 299 U.S. 476, 489, 57 S.Ct. 244, 248, 81 L.Ed. 360 (1937), *aff'd* 304 U.S. 111, 58 S.Ct. 794, 82 L.Ed. 1213 (1938). As perhaps a more direct example of congressional intent that the reservation had been diminished, the restoration of certain lands to the reservation was noted in 9 Fed. Reg. 9746–9754 (August 10, 1944), by stating that the lands "are hereby restored to tribal ownership for the use and benefit of the Shoshone–Arapahoe Tribes of Indians of the Wind River Reservation, Wyoming, and are added to and made a part of the existing Wind River Reservation, subject to any valid existing rights." Clearly, lands that remained part of a reservation would not have to be added to it.

[¶ 31] We conclude from all these factors that it was the intent of Congress in passing the 1905 Act to diminish the Wind River Indian Reservation and to remove from it the lands described as "ceded, granted, and relinquished" thereunder. While the City of Riverton may be located on lands that at one time were within the external boundaries of the reservation, those lands are no longer part of the reservation, and are not "Indian country." Therefore, the State of Wyoming has jurisdiction in this criminal case.

### Did the district court commit reversible error by instructing the jury as to a parent's duty to protect his or her child?

[¶ 32] We recently reiterated our standard for the review of jury instructions in *Seymore v. State,* 2007 WY 32, ¶ 9, 152 P.3d 401, 404 (Wyo.2007):

> Jury instructions should inform the jurors concerning the applicable law so that they can apply that law to their findings with respect to the material facts, instructions should be written with the particular facts and legal theories of each case in mind and often differ from case to case since any one of several instructional options may be legally correct, a failure to give an instruction on

an essential element of a criminal offense is fundamental error, as is a confusing or misleading instruction, and the test of whether a jury has been properly instructed on the necessary elements of a crime is whether the instructions leave no doubt as to the circumstances under which the crime can be found to have been committed.

*Mueller v. State,* 2001 WY 134, ¶ 9, 36 P.3d 1151, 1155 (Wyo.2001) (citing *Schmidt v. State,* 2001 WY 73, ¶ 23, 29 P.3d 76, 83 (Wyo.2001) and *Metzger v. State,* 4 P.3d 901, 908 (Wyo.2000). We analyze jury instructions as a whole and do not single out individual instructions or parts thereof. *Ogden v. State,* 2001 WY 109, ¶ 8, 34 P.3d 271, 274 (Wyo.2001). We give trial courts great latitude in instructing juries and " 'will not find reversible error in the jury instructions as long as the instructions correctly state the law and the entire set of instructions sufficiently covers the issues which were presented at the trial.' " *Id.* (*quoting Harris v. State,* 933 P.2d 1114, 1126 (Wyo.1997)). *Brown v. State,* 2002 WY 61, ¶ 9, 44 P.3d 97, ¶ 9 (Wyo.2002).

[¶ 33] This analysis will be convoluted because of the tortuous path this case took from a one-count charging document to a four-count conviction. Before we even begin to discuss the challenged instruction, it will be necessary to re-tread that path, with excursions into applicable law. The major complication is that the challenged instruction defines a duty that is not relevant to the single crime originally charged, unless that crime, as alleged, is read broadly enough to encompass two allegations as a principal and two allegations as an accessory before the fact.

[¶ 34] At the outset of this case, Blackburn and the appellant were jointly charged under a Felony Information that alleged in pertinent part as follows:

1. On or about July 2, 2004,

2. in Fremont County, Wyoming,

3. MACALIA MARCINE BLACKBURN, (D.O.B. 12/20/1981) and

ANDREW JOHN YELLOWBEAR, JR. (D.O.B. 09/05/1974),

4. while perpetrating the crime of abuse of a child under the age of sixteen (16),

5. killed Marcella Hope Yellowbear, D.O.B. 08/15/2002,

such facts constituting a violation of W.S. § 6–2–101(a) & (b) (1977) as amended[.] [2]

A preliminary hearing was held on February 14, 2005, in the Circuit Court of Fremont County, and the appellant was bound over to district court for trial on this single count of felony murder.

[¶ 35] As a necessary aside, we will point out that the requirement of a preliminary hearing is well-established in Wyoming law. Wyo. Stat. Ann. § 7–8–105 (LexisNexis 2007) provides that, "[i]n all cases triable in district court, except upon indictment, the defendant is entitled to a preliminary hearing." In turn, Wyo. Stat. Ann. § 5–9–132(b) (Lexis-Nexis 2007) provides that "[p]reliminary examinations for persons charged with a felony shall be conducted by the circuit court judge or magistrate." These statutory mandates are carried out primarily in W.R.Cr. P. 5 and 5.1. W.R.Cr.P. 5(c) delineates the procedures that are to be followed at a defendant's initial appearance in circuit court when he is charged with an offense that is triable in district court:

(c) *Offenses charged by information or citation and required to be tried in district court.*—If the charge against the defendant is required to be tried in district court, the defendant shall not be called upon to plead until arraignment in district court.

At the initial appearance, the defendant shall be given a copy of the information or citation and any supporting affidavits. The judicial officer shall read the information or citation to the defendant or state to the defendant the substance of the charge, and shall explain the defendant's right to retain counsel or to request the assignment of counsel if the defendant is unable to obtain counsel, and of the general circumstances under which the defendant may secure pretrial release. The judicial officer shall inform the defendant that the defendant is not required to make a statement and that any statement made by the defendant may be used against the defendant. *The judicial officer shall also inform the defendant of the right to a preliminary examination.* The judicial officer shall allow the defendant reasonable time and opportunity to consult counsel and shall detain or conditionally release the defendant as authorized by statute or these rules.

*A defendant is entitled to a preliminary examination, unless waived, when charged by information or citation with any offense required to be tried in the district court.* If the defendant waives preliminary examination, the case shall be transferred to the district court. If the defendant does not waive the preliminary examination, the judicial officer shall schedule a preliminary examination. . . .

(Emphasis added.)

[¶ 36] W.R.Cr.P. 5.1 details the purposes and procedures of the preliminary hearing:

(a) *Right.*—In all cases required to be tried in the district court, except upon indictment, the defendant shall be entitled to a preliminary examination in the circuit court. The defendant may waive preliminary examination but the waiver must be written or on the record. If the preliminary examination is waived, the case shall be transferred to district court for further proceedings.

(b) *Probable cause finding.*—If from the evidence it appears that there is probable cause to believe that *the charged offense or lesser included offense* has been committed and that the defendant committed it, the judicial officer shall enter an order so finding and the case shall be transferred to the district court for further proceedings. . . .

(c) *Discharge of defendant.*—If from the evidence it appears that there is no proba-

2. Wyo. Stat. Ann. § 6–2–101(a) (LexisNexis 2007) reads as follows:

Whoever purposely and with premeditated malice, or in the perpetration of, or attempt to perpetrate, any sexual assault, sexual abuse of a minor, arson, robbery, burglary, escape, resisting arrest, kidnapping or abuse of a child under the age of sixteen (16) years, kills any human being is guilty of murder in the first degree.

ble cause to believe that an offense has been committed or that the defendant committed it, the judicial officer shall dismiss the information and discharge the defendant. The discharge of the defendant shall not preclude the state from instituting a subsequent prosecution for the same offense.

. . . .

(Emphasis added.)

 [¶ 37] The purpose of a preliminary hearing is to have a neutral fact-finder determine whether there is probable cause to believe that a crime was committed and that the defendant committed that crime. *Madrid v. State*, 910 P.2d 1340, 1343 (Wyo.1996). The circuit court is without authority to transfer to the district court charges other than those contained in the charging document, or lesser-included offenses, and the district court lacks jurisdiction to consider uncharged offenses that are bound over. *Jackson v. State*, 891 P.2d 70, 73–74 (Wyo. 1995).

[¶ 38] Next, we must consider the rules that govern the amendment of a criminal information because that process played an equivalent role in creating the multi-faceted issue now facing the Court. The information, which is the document that provides notice to the defendant of the crime or crimes with which he has been charged, must meet the requirements of W.R.Cr.P. 3(b)(2):

(2) *Information.*—The information shall be a plain, concise and definite written statement of the essential facts constituting the offense charged. It shall be signed by the attorney for the state. It need not contain a formal commencement, a formal conclusion or any other matter not necessary to such statement. Allegations made in one count may be incorporated by reference in another count. It may be alleged in a single count that the means by which the defendant committed the offense are unknown or that the defendant committed it by one or more specified means. The information shall state:

(A) The name of the court where it was filed;

(B) The names of the state and the defendant if the defendant is known, and, if not,

then any names or description by which the defendant can be identified with reasonable certainty; and

(C) *For each count the official or customary citation of the statute, rule, regulation or other provision of law which the defendant is alleged therein to have violated.*

(Emphasis added.)

[¶ 39] W.R.Cr.P. 3(e) governs the amendment of informations:

(e) *Amendment of information or citation.*—Without leave of the court, the attorney for the state may amend an information or citation until five days before a preliminary examination in a case required to be tried in district court or until five days before trial for a case not required to be tried in district court. The court may permit an information or citation to be amended:

(1) With the defendant's consent, at any time before sentencing.

(2) Whether or not the defendant consents:

(A) At any time before trial if substantial rights of the defendant are not prejudiced.

(B) At any time before verdict or finding *if no additional or different offense is charged and if substantial rights of the defendant are not prejudiced.*

(Emphasis added.)

[¶ 40] We will now consider how these rules of law apply to the particular facts of this case. As stated above, the original Felony Information charged the appellant with one count of felony murder for killing his daughter "while perpetrating the crime of abuse of a child under the age of sixteen (16) [years.]." *See supra* at ¶ 34. On March 24, 2005, the State filed an Amended Felony Information, with the first count being similar to, but worded differently from the original charge, and with an additional second count. The two counts of the Amended Felony Information read in pertinent part as follows:

### COUNT 1—FIRST DEGREE MURDER

1. On or about July 2, 2004,

2. in Fremont County, Wyoming,

ANDREW JOHN YELLOWBEAR JR. (D.O.B. 09/05/1974),

3. while perpetrating or attempting to perpetrate the abuse of Marcella Hope Yellowbear, D.O.B. 08/15/2002, a child under the age of sixteen (16) years,

4. killed Marcella Hope Yellowbear, a human being.

. . . .

### COUNT 2—ACCESSORY BEFORE THE FACT TO FIRST DEGREE MURDER

1. On or between May 15, 2004 and July 2, 2004,

2. in Fremont County, Wyoming,

3. ANDREW JOHN YELLOWBEAR JR., (D.O.B. 09/05/1974),

4. knowingly aided or abetted another person, Macalia Marcine Blackburn, in the commission of a felony, specifically the perpetration or attempt to perpetrate the abuse of Marcella Hope Yellowbear, D.O.B. 08/15/2002, a child under the age of sixteen (16) years and said abuse resulted in the death of Marcella Hope Yellowbear, a human being.

such facts constituting a violation of W.S. § 6–1–201, (1977) as amended[.]

[¶ 41] Almost immediately, the appellant filed a motion to strike the amended information, alleging: (1) the State did not have leave of court to file the amended information; (2) the appellant had not consented to the amendment; (3) the appellant's rights were prejudiced by the amendment; (4) the first count in the new information alleged new elements; and (5) the second count alleged a new charge for which there had been no preliminary hearing. At the arraignment held soon thereafter, the district court noted these difficulties with the amended information and chose to arraign the appellant on the single original charge. The State responded by filing a motion to strike its own amended information. In what can only be described as a strange turn of events, the appellant then contested the State's motion to strike, arguing that, by its statements during the arraignment, the district court had, in effect, remanded the entire matter to the circuit court for another preliminary hearing. The court granted the State's motion and the case continued under the original single-count information.

[¶ 42] On May 20, 2005, the appellant filed another motion to dismiss the information. The contentions of that motion may be summarized as follows: (1) the information is not explicit as to the manner in which the appellant is alleged to have violated the child abuse statute, which statute is complex and can be violated in a number of ways; and (2) Blackburn and the appellant are charged in the conjunctive, with no indication of what acts either allegedly committed. Fundamentally, the appellant alleges that the information is so inadequate as to violate his constitutional due process right to notice of the charges being made against him. On the same date, the appellant filed a motion for bill of particulars stating essentially the same grievances.

[¶ 43] The motion for bill of particulars was heard on June 16, 2005. The appellant set forth in detail the arguments contained in his motions, and the State responded with the contention that the appellant, rather than seeking clarification of the charge, was seeking "evidence, facts, theories, and strategies." The district court resolved the dispute by ordering the State to provide a bill of particulars specifying which subsection of the child abuse statute, Wyo. Stat. Ann. § 6–2–503 (LexisNexis 2007), was the basis for the underlying felony.

[¶ 44] The State complied with the district court's order by filing a one-sentence bill of particulars declaring that "the State asserts the Defendant, in the alternative, violated W.S. § 6–2–503(a) or W.S. § 6–2–503(b)." [3] Concurrently, the State filed a

---

**3.** Wyo. Stat. Ann. § 6–2–503 (LexisNexis 2007) reads as follows:

(a) Except under circumstances constituting a violation of W.S. 6–2–502, a person who is not responsible for a child's welfare as defined

response to the appellant's earlier motion to dismiss the information, which motion had not been heard at the time the motion for bill of particulars was heard. The appellant replied almost immediately with another motion to dismiss the information. In addition to the contentions raised in his earlier motion, the appellant added the following:

 3. It is improper for child abuse to serve as the predicate for felony murder. This underlying charge could not have involved conduct with a felonious purpose other than that the alleged conduct purportedly killed the victim.

 4. To permit such a felony-murder charge of this nature would eliminate the need for the State to prove an intentional or knowing killing in most murder cases.

 5. It would be improper to find anyone similarly charged to be a first degree murderer when the predicate felony was inherent in the killing and when the State fails or cannot prove another form of first degree murder to the jury.

[¶ 45] The appellant fleshed out these arguments in a memorandum of law outlining the perceived difficulty that results from basing a first-degree murder charge upon an underlying assaultive-type crime: the distinctions among homicides would be rendered meaningless because all second-degree murders and manslaughters would become first-degree felony murders. The State countered these arguments by repeating its earlier response to the motion for a bill of particulars—that the notice provided by the information was sufficient—by pointing out that the language of Wyo. Stat. Ann. § 6–2–101(a) clearly includes child abuse as a predicate felony for felony murder, and by citing *Johnson v. State*, 2003 WY 9, ¶ 34, 61 P.3d 1234, 1248 (Wyo.2003), for the proposition that the statute gives fair notice that if a child dies as the result of child abuse, then the potential penalties include execution or life in prison.

[¶ 46] The appellant's first motion to dismiss the information was heard on August 12, 2005. Primarily, the appellant argued that he was unable to prepare a defense to the crime as charged, even as clarified by the bill of particulars, because the child abuse statute can be violated in so many separate ways. The State argued that the information was sufficient because it alleged all the necessary elements of the crime of felony murder, and that the bill of particulars was sufficient because it apprised the appellant of the fact that the State intended to allege in the alternative in regard to the child abuse statute.[4] The district court took the issue under advisement for issuance of a written decision.

[¶ 47] All that we have written so far on this issue has been prologue to what happened next. On August 25, 2005, the district court authored a decision letter siding largely with the appellant. Although the court denied the motion to dismiss, it did agree with the appellant that the existing felony information was insufficient to provide notice to him as to what crime was charged, and that it would create a *"Tanner* problem" when it came time to instruct the jury.[5] To remedy

---

by W.S. 14–3–202(a)(i), is guilty of child abuse, a felony punishable by imprisonment for not more than five (5) years, if:

 (i) The actor is an adult or is at least six (6) years older than the victim; and

 (ii) The actor intentionally or recklessly inflicts upon a child under the age of sixteen (16) years:

 (A) Physical injury as defined in W.S. 14–3–202(a)(ii)(B); or

 (B) Mental injury as defined in W.S. 14–3–202(a)(ii)(A).

 (b) Except under circumstances constituting a violation of W.S. 6–2–502, a person is guilty of child abuse, a felony punishable by imprisonment for not more than five (5) years, if a person responsible for a child's welfare as defined in W.S. 14–3–202(a)(i) intentionally or recklessly inflicts upon a child under the age of eighteen (18) years:

 (i) Physical injury as defined in W.S. 14–3–202(a)(ii)(B), excluding reasonable corporal punishment; or

 (ii) Mental injury as defined in W.S. 14–3–202(a)(ii)(A).

4. The State indicated that it needed to allege in the alternative both Wyo. Stat. Ann. § 6–2–503(a) and Wyo. Stat. Ann. § 6–2–503(b) because Tribal Social Services had legal custody of Marcella at the time she died, leaving open the question of whether Blackburn and the appellant were "responsible for [the] child's welfare" under the statute.

5. In *Tanner v. State*, 2002 WY 170, ¶¶ 8–14, 57 P.3d 1242, 1245–46 (Wyo.2002), we held that, in

the situation, the district court ordered as follows:

> The Motion to Dismiss is denied; however, the State is to file an Amended Information specifying in detail the exact nature of the charges against the Defendant. The Amended Information must include the specific portions of the child abuse statute upon which the State relies. Nothing in this letter precludes the State from pleading in the alternative; however, if the State is choosing to do so, it must set out the alternative theories in the Information. Furthermore, the State must draft a proposed verdict form and proper elements instruction(s). The proposed verdict form and elements instruction(s) are to be consistent with the Amended Information and should be drafted under the guidance provided in the *Tanner* line of cases....

[¶ 48] Even before the order implementing the decision letter was filed, the State had filed a single document entitled "Amended Felony Information, Proposed Verdict Form and Proposed Jury Instructions." It is this instrument that changed the course of these proceedings and resulted in the issue that we now address. Instead of charging a single count of felony murder under alternative theories, it charged four separate crimes: one count of felony murder based upon intentional physical injury child abuse, one count of felony murder based upon reckless physical injury child abuse, one count of accessory before the fact to felony murder based upon aiding and abetting Blackburn in intentional physical injury child abuse, and one count of accessory before the fact to felony murder based upon aiding and abetting Blackburn in reckless physical injury child abuse.

[¶ 49] Perhaps not surprisingly, the appellant filed yet another motion to dismiss. In addition to all of his earlier arguments, the appellant now averred that the amended information alleged new and different crimes. The State's response disavowed any intent to charge new crimes and declared that the purpose of the amended information, filed at the court's direction, was to separate out what the appellant had always known: that the State would allege, alternatively, that the appellant had recklessly or intentionally abused his daughter and killed her, or that Blackburn had done so, with the appellant aiding and abetting her in such a fashion that he associated himself with her in commission of the crime. In particular, the State noted that Wyo. Stat. Ann. § 6–1–201(b)(i) (LexisNexis 2007) allows an accessory before the fact to be "informed against" as if he were the principal.[6]

[¶ 50] We will not detail the appellant's reply to the State's response to its motion to dismiss, except to note that the appellant asserted his right to a preliminary hearing on the amended information. He did so again when the motion to dismiss was heard on October 10, 2005. The motion to dismiss was denied on the ground that the amended information did not add new crimes or materially change the allegations of the original felony information. The district court's conclusion that new crimes had not been added likely explains why the district court did not remand the case for a preliminary hearing, or arraign the appellant on the four charges of the amended information, or require the appellant to enter a plea to each charge.[7] The logical inference that must be drawn from all of this, despite the verdict form which we will discuss more in detail later, is that the appellant actually was only convicted

cases where the State charges alternative theories of guilt, the information, the instructions, and the verdict form must be constructed to leave no doubt, if guilt is found, as to jury unanimity upon a particular alternative.

6. Wyo. Stat. Ann. § 6–1–201 (LexisNexis 2007) reads in pertinent part as follows:
 (a) A person who knowingly aids or abets in the commission of a felony, or who counsels, encourages, hires, commands or procures a felony to be committed, is an accessory before the fact.

 (b) An accessory before the fact:
 (i) May be indicted, informed against, tried and convicted as if he were a principal;
 ....

7. The district judge who presided over the arraignment, and who suggested then that a remand to the circuit court for another preliminary hearing on the amended information was necessary, was peremptorily disqualified under W.R.Cr.P. 21.1, and had been replaced by another district judge.

of one crime—felony murder—which crime the jury found he committed in more than one of the alternative methods alleged by the State. *See infra* at ¶ 58.

[¶ 51] It is this conclusion that brings us full circle because it brings us to the point where we must ask whether the contested instruction had any improper effect upon the verdict. The contested instruction began as the State's proposed Instruction No. 30, entitled "Aiding and Abetting by Violating Duty to Protect Child." As proposed, it read as follows:

When considering whether defendant aided or abetted Macalia Blackburn in the crime of felony child abuse murder, you may consider whether defendant knew of a serious and immediate threat to the welfare of Marcel[l]a Yellowbear and failed to act to protect Marcel[l]a Yellowbear from that harm. That is, whether there is evidence from which it can be inferred that the defendant knew that Marcel[l]a Yellowbear was sustaining injury and, based on the severity of the injuries being sustained, knew that there was a substantial risk that death or great bodily injury would result if the defendant did not act to protect Marcel[l]a Yellowbear.

Parents are required to intercede on their child's behalf and, if they fail to act, they risk being held responsible for the other person's criminal conduct. By failing to act, the parent may be deemed to have implicitly sanctioned the criminal behavior and, therefore, may be held accountable for the abusive conduct. Even in situations where the parent is not present at the time when the abuse resulting in death takes place, the parent may be held accountable for the criminal conduct resulting in death, if it is proved that the parent knew that the child had been abused by the principal in the past and, because of the nature of previous injuries sustained by the child, also knew there was a substantial risk of serious harm, yet took

no action to protect the child from future injury by the abuser.

[¶ 52] As authority for the proposed instruction, the State cited *People v. Pollock*, 202 Ill.2d 189, 215–16, 269 Ill.Dec. 197, 780 N.E.2d 669, 684 (2002). The State also filed a lengthy memorandum of law in support of the instruction, in which it cited Wyoming statutes and cases, and cases from numerous other jurisdictions, that establish a parent's duty to protect his or her child. The appellant objected to the proposed instruction by filing his own memorandum of law, with its principal argument being that a parent's duty to protect his or her child is not an element of the underlying felony of child abuse or of the accessory before the fact statute. In other words, in the view of the appellant, the State's proposed instruction would add a crime of omission to the crimes of commission defined by the statutes. During the instruction conference held at the end of the guilt phase of the trial, the appellant refined this argument by noting that the giving of a parental duty instruction would, in effect, replace the underlying crime of child abuse with the crime of child endangerment, with which he had not been charged.[8]

[¶ 53] After much debate, and over the appellant's objection, the district court decided to instruct the jury as to "parental duty." Before we quote the two instructions that he gave in lieu of the State's proposed instruction, we will first set forth Wyoming's pattern jury instructions that normally would be given in a case alleging that the defendant aided and abetted in the commission of a crime:

W.P.J.I.C. 7.01A ACCESSORY BEFORE THE FACT—RESPONSIBILITY

It is not necessary that the defendant personally did every act necessary to constitute the crime of _____. It is enough if [he knowingly aided and abetted someone else to commit the crime of _____] [he counseled, encouraged, hired, commanded or procured some other

---

8. Wyo. Stat. Ann. § 6-4-403 (LexisNexis 2007) reads in pertinent part as follows:

 (a) No parent, guardian or custodian of a child shall:

 (i) Abandon the child without just cause; or

 (ii) *Knowingly or with criminal negligence cause, permit or contribute to the endangering of the child's life or health by violating a duty of care, protection or support.*

(Emphasis added.)

person to commit the crime of _____, and the crime was attempted or committed.

## W.P.J.I.C. 7.01B ACCESSORY BEFORE THE FACT—ELEMENTS

The elements of being an Accessory Before the Fact to the Crime of _____ are:

1. On or about the ____ day of _____, 200__

2. In _____ County, Wyoming

3. The Defendant, _____

4. Knowingly [aided or abetted another person in the {commission of} {attempt to commit} the crime of _____]

[counseled, encouraged, hired, commanded or procured the crime of _____ to be committed by another person], and

5. That other person [committed] [attempted to commit] the crime of _____.

. . . .

## W.P.J.I.C. 7.01C ACCESSORY BEFORE THE FACT—MERE PRESENCE AT THE SCENE OF THE CRIME INSUFFICIENT TO CONVICT

Merely being present at the scene of a crime or merely knowing that a crime is being committed or is about to be committed is not sufficient conduct for the jury to find that the defendant was an accessory before the fact to that crime. The State must prove that the defendant knowingly associated himself with the crime in some way as a participant—someone who wanted the crime to be committed—and not as a mere spectator.

■ [¶ 54] We have identified the basic elements of the crime of accessory before the fact as being (1) someone committed the underlying felony; and (2) the defendant participated in that crime. *Hawkes v. State*, 626 P.2d 1041, 1044 (Wyo.1981); *see also Goldsmith v. Cheney*, 447 F.2d 624, 627–28 (10th Cir.1971) (To prove aiding and abetting, the State must prove that the crime "was committed by someone and that the person charged as an aider and abettor associated himself and participated in the accomplishment and success of the criminal venture").

In the instant case, the district court did not give these pattern instructions and it did not define the crime of being an accessory before the fact as we did in *Hawkes*. Instead, the district court instructed the jury as follows:

### INSTRUCTION NO. 30

To convict a person of aiding or abetting (accessory before the fact), it must be proved that the crime was committed by someone and that the aider or abettor associated himself with and participated in the accomplishment and success of the criminal venture.

Merely being present at the scene of a crime or merely knowing that a crime is being committed or is about to be committed is not sufficient conduct for the jury to find that the Defendant was an accessory before the fact to the crime *unless the Defendant had a duty to prevent the crime and a reasonable opportunity to do so, and the jury finds that the Defendant's failure to take reasonable steps to prevent the crime constituted knowingly aiding or abetting in the commission of the crime* or counseling, encouraging or commanding someone to commit the crime.

The State must prove either:

1. That the Defendant knowingly associated himself with the crime in some way as a participant—someone who wanted the crime to be committed—and not as a mere spectator; or

2. *That the Defendant knew that the child had been abused in the past, and because of the nature of the previous injuries, knew there was an imminent danger to the physical health or welfare of the child, and took no action to protect the child from the abuser; and that the Defendant's failure to act constituted knowingly aiding or abetting in the commission of the crime or counseling, encouraging or commanding someone to commit the crime.*

(Emphasis added.)

### INSTRUCTION NO. 31

It is the duty of a parent to protect their children and to do whatever may be rea-

sonably necessary for their care and their safety.

[¶ 55] Before deciding to give these instructions, the district court heard at length from both counsel, described its own research into the matter, and literally agonized on the record as to whether the instructions should be given. Its final decision was based upon the following rationale:

THE COURT: This—as I indicated, this is a very difficult problem. And quite frankly, as I've gone through it from the moment I first got the State's memorandum to the defendant's memorandum, I have gone back and forth. My first reaction was not to instruct on a duty. And I did some substantial research.

Obviously, there is no—nothing in Wyoming that directs us to do this or directs us not to do it; but certainly there is no authority for giving this instruction.

Maybe the initial question is does Wyoming—*does the common law of Wyoming provide that* the parents have a duty to protect and care for their children. It seems to me that they do.

Now, the statutes are all civil statutes, but there are adoption statutes; for example, In re, Adoption TLC, which is at 46 Pacific 3d, they talk about the customary parental duties of a parent who is not incarcerated. And a termination case, MBB versus ERW, the State talks about its duty to supervise the welfare of the children and promote their best interest when the State takes over custody. Now, it seems to me if the State has that duty, the parent has at least as great a duty. The Dellapenta case talks about the duty to buckle in, which implies there is some duty to provide the safety of the children.

One of the statutes, 14–2–403, talks about parental rights or duties. So I—I think in Wyoming, by implication, at least, there is a parental duty to protect and care for their children.

*Then the question is, Should the jury be instructed on them? In other words, would the Supreme Court, if it were to address this, say, Is there an exception to the general rule that mere presence at the scene o f a crime does not make a*

*person an accomplice; or would they say that there is an exception that where there's an affirmative common-law duty, they may be guilty of criminal conduct by failure to act, or what I think the State referred to as an act of omission?*

(Emphasis added.)

 [¶ 56] The district court's instincts were correct; these instructions should not have been given. Wyo. Stat. Ann. § 6–1–102(a) (LexisNexis 2007) provides in pertinent part as follows:

(a) Common-law crimes are abolished. No conduct constitutes a crime unless it is described *as a crime* in this act or in another statute of this state. . . .

(Emphasis added.) We have recognized this principle many times. *See Mares v. State,* 939 P.2d 724, 727 (Wyo.1997); *Bush v. State,* 908 P.2d 963, 965–66 (Wyo.1995); and *Keser v. State,* 706 P.2d 263, 269 (Wyo.1985). Consequently, the important question is not what may have constituted a common-law crime, but what the crime is under the language of the statute alleged in the charging document. *Keats v. State,* 2003 WY 19, ¶ 25, 64 P.3d 104, 112 (Wyo.2003). The words of the statute emphasized above—"as a crime"—make it clear that conduct may not be charged as a crime unless it is made a crime by statute. Furthermore,

[I]t is well settled that criminal statutes are to be strictly construed, which means that they are not to be enlarged by implication or extended by inference or construction * * *. This rule, said to be based upon a conception of manifest justice and the plain principle that the power of punishment is vested primarily in the Legislature, requires a sufficient degree of certainty in a criminal statute, that will place it outside the necessity of judicial determination, through mere implication or construction, of who or what acts are punishable under it. . . .

*State v. Stern,* 526 P.2d 344, 350 (Wyo.1974), quoting *State v. A.H. Read Co.,* 33 Wyo. 387, 240 P. 208, 212–13 (1925).

[¶ 57] It was error for the district court to instruct the jury as it did about parental duty because neither the crime of child

abuse, nor the crime of accessory before the fact contains that duty as an element, or makes criminal a violation of such duty. Therefore, we must evaluate, in the context of the charging-document complexities described above, whether the error prejudiced the appellant's right to a fair trial. *Mainville v. State*, 607 P.2d 339, 343 (Wyo.1980); W.R.A.P. 9.04.

■ [¶ 58] Succinctly stated, the four theories of guilt to be separately considered by the jury were: (1) the appellant killed Marcella by intentionally physically abusing her; (2) the appellant killed Marcella by recklessly physically abusing her; (3) the appellant aided and abetted Blackburn, who killed Marcella by intentionally physically abusing her; and (4) the appellant aided and abetted Blackburn, who killed Marcella by recklessly physically abusing her. The verdict form clearly delineated these theories and required the jury to decide each of them separately. The jury found the appellant guilty under all four theories. Without more, we would have to conclude that the appellant was prejudiced as to both accessory theories, due to inclusion of the parental-duty instructions. However, the verdict form in this case was very thorough and complete, and as to each accessory count, the jury was required to answer the following special interrogatory:

> Do you find that the Defendant knowingly associated himself with the crime in some way as a participant—someone who wanted the crime to be committed—and not as a mere spectator?

By twice answering this question in the affirmative, the jury effectively negated any harm that may have occurred as a result of inclusion of the parental-duty concept. That is, the jury found that the appellant's crimes were crimes of commission, and not crimes of omission or lapse in duty, and therefore satisfied the dictates of the statute and *Hawkes*. *See supra* at ¶¶ 49, 54.

[¶ 59] We will summarize our conclusions in this section of the opinion as follows:

■ 1. While the statute allows a person charged with aiding and abetting to be informed against and convicted as if he were a principal, that is not what the State did in this case. Rather, the State charged the appellant with four theories of liability under one count: two as a principal and two as an accessory. The verdict form and judgment and sentence make it appear as though the appellant were charged with, and convicted of, four separate crimes.

■ 2. The appellant was afforded a preliminary hearing on only one crime, was arraigned on only one crime, and entered a plea to only one crime, leading to the inexorable conclusion that he could be convicted of only one crime.

3. The jury separately considered and determined each theory of guilt. Our review of the record indicates that there was sufficient evidence to support each of those findings of guilt.

4. Inclusion of the parental-duty instruction was erroneous, but such error was harmless, given the circumstances set forth above.

■ [¶ 60] Finally, we will note that the language of Wyo. Stat. Ann. § 6–1–201(b)(i) that allows an accessory before the fact to "be indicted, informed against, tried and convicted as if he were a principal," is fraught with danger, given the need for notice, specificity, and due process in criminal proceedings. This case should be adequate evidence of that fact. We have previously stated that the rationale behind this language, which "abrogated the common-law distinctions between principal, aider and abettor, and accessory before the fact," was to allow all to be treated as a principal for purposes of punishment. *Jahnke v. State*, 692 P.2d 911, 920–21 (Wyo.1984), *overruled on other grounds by Vaughn v. State*, 962 P.2d 149 (Wyo.1998). It might have been better simply to say the latter. At the very least, prosecutors must be aware that they cannot charge both that a defendant acted as a principal and that he acted as an accessory before the fact, as two separate crimes, in one count.

*Did the prosecutor commit misconduct during rebuttal closing argument by inserting his own credibility and beliefs, by arguing facts not in evidence, and by presenting an argument that was not properly a rebuttal argument?*

[¶ 61] The district judge met with counsel in chambers after the trial phase verdict was received, at which time the following colloquy occurred:

[DEFENSE COUNSEL]: Although we did not do so at the time the rebuttal closing was made, we would object to the improper form and nature of the rebuttal closing. I believe that it constituted prosecutorial misconduct, and we would move the Court for a mistrial based on that at this time.

THE COURT: All right. The Court agrees that it was not appropriate rebuttal. It was not rebuttal in the sense that it did not address comments made by the defense during its closing and not reasonably anticipated; however, I don't have any reason to believe and the defense has not stated anything that indicates that it is prejudicial. I treat it almost like a plain-error analysis, and I will deny that motion.

[¶ 62] After the penalty phase of the trial, but prior to sentencing, the appellant filed a motion for new trial, based upon the same grounds, but with more detail as to the alleged prosecutorial misconduct:

3. During the state's "rebuttal closing," the prosecution did not respond to the defense closing argument. Instead, the prosecution made improper comments, such as calling Mr. Yellowbear "the father from hell" and injecting his personal opinions about Mr. Yellowbear's guilt by stating that he had spoken to his mother about the case who stated something to the effect of "sometimes the weak and the defenseless children only find refuge in the grave." Such statements also constituted arguing facts not in evidence before the jury. Thus, the rebuttal closing was improper, inflammatory and prejudicial to Mr. Yellowbear.

[¶ 63] The motion was heard on May 9, 2006. After brief argument from counsel, the district court ruled as follows:

I agree with [the prosecutor] that this has to receive a plain-error analysis since there was no contemporaneous objection to [the prosecutor's] remarks. The record does reflect that the incident alleged occurred.

The movant in this case, Mr. Yellowbear, through counsel, must demonstrate violation of a clear and unequivocal rule of law. That's a little more close, but I also think that counsel has met that obstacle.

[The prosecutor] did say, "Her first line was, There is no credible evidence that my client wished harm on Marcella in any way." That, perhaps, is proper rebuttal. The balance of the argument I don't believe is appropriate rebuttal. It does not address factual issues raised by [defense counsel] in her closing argument. It basically is a conclusion that should have been given at the State—at the close of the State's primary argument, at least in large part.

Having said that I don't think it's proper rebuttal and I'm convinced that it is not proper rebuttal, Yellowbear has to show—Mr. Yellowbear has to show that his substantial rights have been abridged. And I don't think this is the case in this situation for a number of reasons.

First, the remarks were relatively succinct. [The prosecutor] didn't drag it out. While he wasn't making rebuttal, he just made a brief repetition of the closing or the conclusion of the primary argument. He did not call into question his [sic] credibility of the witnesses to any extent. He didn't insert his own personal belief. And given the evidence that was presented, I don't believe that even if [defense counsel] had objected that this would have affected the outcome of the trial. Frankly, if [defense counsel] had objected, I probably would have stopped [the prosecutor]. I'm not being critical of counsel and I don't think it's ineffective counsel not to object. I recognize that there is a substantial school of law that—or school of thought that in legal arguments, counsel should be given sufficient and substantial latitude, and I think that's what [defense counsel] was doing. And having ruled that I don't think this is significant, I think her failure to object is fairly inconsequential.

So I'm going to deny the motion for a new trial.

[¶ 64] It is customary for us, before discussing an issue, to set forth the standard of review that will be applied. That is harder to do in this case than it usually is. The appellant presents the issue as if it were simply one of prosecutorial misconduct to which there was no objection, meaning our review would be for plain error. *See Adams v. State*, 2005 WY 94, ¶ 18, 117 P.3d 1210, 1217 (Wyo.2005). The State, perhaps understandably, agrees that plain error review is appropriate, citing *Seymore v. State*, 2007 WY 32, ¶ 17, 152 P.3d 401, 407 (Wyo.2007) for the proposition that a *contemporaneous* objection is required to avoid plain error analysis. The purpose of the plain error rule, however, is to allow us to review errors that "were not brought to the attention of the trial court." W.R.A.P. 9.05. It seems to go without saying that, where the issue *was* raised and decided below, the first two elements of the plain error test are inapplicable.[9]

[¶ 65] The problem with plain error review in this case is that the district court considered and decided the question of prosecutorial misconduct in the rebuttal closing, not once, but twice. In denying the appellant's oral motion for a mistrial, the district court found that the rebuttal closing was not proper rebuttal, but that it was not prejudicial. Similarly, in denying the appellant's subsequent written motion for a new trial, the district court concluded that the appellant's substantial rights had not been abridged by the rebuttal closing, even if it were improper. Consequently, what we are really doing here is reviewing the denial of the motion for mistrial and the denial of the motion for a new trial.

[¶ 66] We review the denial of a motion for mistrial for an abuse of discretion. *Martin v. State*, 2007 WY 2, ¶ 11, 149 P.3d 707, 710 (Wyo.2007). The same standard applies to review of the denial of a motion for a new trial. *Barker v. State*, 2006 WY 104, ¶ 12, 141 P.3d 106, 112 (Wyo.2006). In either case, an abuse of discretion occurs where the

district court could not have reasonably concluded as it did. *Thomas v. State*, 2006 WY 34, ¶ 10, 131 P.3d 348, 352 (Wyo.2006); *Gunnett v. State*, 2005 WY 8, ¶ 15, 104 P.3d 775, 779 (Wyo.2005).

[¶ 67] It is important to remember that there is a distinction between the role of this Court and the role of the district court in regard to both of these motions. The district court is not applying a standard of review when it determines the motion. Rather, in the case of a motion for mistrial, the district court is governed by the following principles:

> Granting a mistrial is an extreme and drastic remedy that should be resorted to only in the face of ***an error so prejudicial that justice could not be served by proceeding with trial.***

(Emphasis added.) *Warner v. State*, 897 P.2d 472, 474 (Wyo.1995); *see also Martin*, 2007 WY 2, ¶¶ 18–19, 149 P.3d at 712. This is similar to the district court's role in determining a motion for a new trial, where W.R.Cr.P. 33(a) dictates that the court may grant such a motion "if required in the interest of justice." In discussing this rule, we have repeatedly stated that it is the appellant's burden to show how he was prejudiced by the denial. *See, e.g., Doherty v. State*, 2006 WY 39, ¶ 27, 131 P.3d 963, 972 (Wyo. 2006); *Gunnett*, 2005 WY 8, ¶ 18, 104 P.3d at 780; *Black v. State*, 869 P.2d 1137, 1141 (Wyo.1994); *Calene v. State*, 846 P.2d 679, 684 (Wyo.1993); *Garcia v. State*, 777 P.2d 603, 609 (Wyo.1989); *Gist v. State*, 737 P.2d 336, 343 (Wyo.1987).

[¶ 68] Boiled down to its essence, the process is this: (1) when a motion for mistrial or new trial is presented, the district court considers the motion and grants it if justice so requires; (2) justice requires that the motion be granted only if the appellant has been prejudiced because his or her substantial rights were abridged; (3) if the motion is denied, and that denial is appealed, we review that denial for an abuse of discretion; (4) abuse of discretion has occurred where the district court could not

---

9. Plain error analysis requires the appellant to show (1) the record clearly reflects; (2) the violation of a clear and unequivocal rule of law; (3) resulting in the abridgment of a substantial right

to the appellant's material prejudice. *Doherty v. State*, 2006 WY 39, ¶ 18, 131 P.3d 963, 969 (Wyo.2006) (*quoting Helm v. State*, 1 P.3d 635, 639 (Wyo.2000)).

have reasonably concluded as it did. With specific regard to claims of prosecutorial misconduct during closing argument, we consider the alleged misconduct in the context of the entire argument, and the entire record, with the determinative factor being whether, in the absence of the error, the verdict might have been more favorable to the accused. *Phillips v. State,* 2007 WY 25, ¶ 8, 151 P.3d 1131, 1133–34 (Wyo.2007); *see also Talley v. State,* 2007 WY 37, ¶ 9, 153 P.3d 256, 260 (Wyo.2007); *Butcher v. State,* 2005 WY 146, ¶ 39, 123 P.3d 543, 554 (Wyo.2005); *Burton v. State,* 2002 WY 71, ¶¶ 11–12, 46 P.3d 309, 313 (Wyo.2002). Although the district court in the instant case stated that it was applying plain error analysis to its determination of both motions, the record reveals that what it actually did was to consider the alleged prosecutorial misconduct under the above standard and to find that the appellant was not prejudiced, which process was appropriate.

 [¶ 69] Because the prosecutor's rebuttal closing argument was brief, and because the allegations of misconduct must be viewed in context, we will set forth the entire rebuttal closing:

[PROSECUTOR:] Thank you, Judge.

Ladies and gentlemen, you have heard much evidence and testimony over the last few days. I won't repeat it to you.

What counsel has said is not evidence, and there's a reason for that. Her first line was, There is no credible evidence that my client wished harm on Marcella in any way. Look at those pictures. That man is the father from hell. The defendant did to Marcella what he wanted. She took it for as long as she could, and she died. She died because of him.

And now is the time to hold him responsible. Only you can do that. I ask you, on behalf of the people of the state of Wyoming, to go into that jury room, to deliberate, to think about this case thoroughly, to consider each and every piece of evidence, including that murder weapon right there, and to mark guilty as to each of those four counts on that verdict form, and to answer

yes as to each of those three questions that follow the verdicts on Counts 3 and 4.

An old Greek philosopher said, The strong do as they will; the weak endure what they must.

This case is over. This case is over for Marcella, but it is not over until justice is done.

My mom said—when I talked to her about this case, she said, Some of these kids have no refuge but the grave. And Marcella is crying out to you from the grave today.

Now is the time to hold Mr. Yellowbear—to hold Mr. Yellowbear responsible for his conduct; not to shift the blame to someone who isn't present in this courtroom, but to hold him responsible for what he did and what he didn't do. He is guilty. The evidence shows you he is guilty of each of these four counts.

And when you're back there deliberating, I hope you'll do one thing for me. Pick out State's Exhibit 72. Pick it out and set it someplace where you all can see it. And you'll know, when you look at that exhibit, what must be done in this case.[10]

Now is the time to hold the defendant responsible, to make him accountable for what he did, for the choices he made, for everything that he permitted to happen, that he chose not to stop. And there's a laundry list nine days long. Nine days long, the evidence showing that that defendant is responsible for the murder of his daughter, who was not even two years old, a baby. And that man is responsible for her murder. And he wants to walk out of here a free man? I don't think so.

Thank you very much.

[¶ 70] The appellant challenges this rebuttal argument on several grounds: (1) that it was not proper rebuttal in that it did not respond to comments or arguments raised in the appellant's closing argument; (2) that it argued facts not in evidence; (3) that the prosecutor inserted his own beliefs and credibility; (4) that it appealed to the jury's pas-

---

10. According to the Index to Jury Trial Proceedings, Exhibit 72 is a "Life photograph of Marcel-

la Hope Yellowbear."

sions; and (5) that it told the jury it had a duty to convict the appellant. When the district court orally denied the motion for new trial, it first agreed with defense counsel that the prosecutor "wasn't making rebuttal," and that his statements were, to that extent, improper. The district court concluded, however, that the appellant was not prejudiced because the rebuttal closing was brief, that the prosecutor did not call into question the credibility of any witnesses, and that he did not insert his own personal beliefs into the argument. Further, the district court opined that, even had an objection to the rebuttal closing been made and sustained, it would not have affected the outcome of the trial, given the evidence that was presented. Instead, the district court characterized the matter as not being significant and as being "fairly inconsequential."

[¶ 71] We cannot find that the district court abused its discretion in reaching these conclusions. This was a nine-day jury trial with dozens of witnesses and dozens of exhibits. The incriminating evidence was powerful and overwhelming. The State's closing argument consumes twenty-eight transcript pages. The defense closing is thirty-five pages in length. It is not reasonably likely or probable that the prosecutor's few words in rebuttal had any prejudicial effect upon the outcome of the trial.

[¶ 72] While the prosecutor's description of the appellant as the "father from hell" and the reference to the conversation the prosecutor had with his mother were not well-advised, they are comparable to comments that we previously have found not to constitute reversible error. *See James v. State,* 888 P.2d 200, 207 (Wyo.1994) (prosecutor calls defendant a leech and a predator); *Tennant v. State,* 786 P.2d 339, 346 (Wyo.1990) (prosecutor calls defendant a leech, a bloodsucker, and a predator). In the context of the entire record of the present case, we reach the same conclusion here: this brief rebuttal closing was not reversible error. Furthermore, while the characterization of the appellant was extreme, it was made in response to defense counsel's argument that "there is no credible evidence that my client wished harm on Marcella in any way," and

the prosecutor followed the characterization with a direction to the jury to "[l]ook at the pictures." Though perhaps inartful and extreme, this was an attempt to connect the characterization to the evidence.

[¶ 73] We have often stated that the purpose of closing argument is to allow counsel to suggest ways for the jury to view the evidence, and that prosecutors, like defense counsel, have the right to review the evidence and to explore the logical inferences that arise therefrom. *See, e.g., Moe v. State,* 2005 WY 58, ¶ 20, 110 P.3d 1206, 1214 (Wyo. 2005); *Leiker v. State,* 994 P.2d 917, 919 (Wyo.1999). In *Trujillo v. State,* 2002 WY 51, ¶ 5, 44 P.3d 22, 24–25 (Wyo.2002), we adopted the following ABA standards as guidelines for prosecutorial argument:

(a) The prosecutor may argue all reasonable inferences from evidence in the record. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

(b) It is unprofessional conduct for the prosecutor to express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.

(c) The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury.

(d) The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict.

(e) It is the responsibility of the court to ensure that final argument to the jury is kept within proper, accepted bounds.

This last guideline is consistent with our previous observation that the scope of permissible argument is best determined by the trial judge because he or she is in the best position to assess the appropriateness of the argument and any prejudice that may result. *See Harper v. State,* 970 P.2d 400, 403 (Wyo. 1998); *Mintun v. State,* 966 P.2d 954, 959–60 (Wyo.1998); *Dennis v. State,* 963 P.2d 972, 976 (Wyo.1998).

[¶ 74] Our assessment of the State's closing argument in the instant case is that it violated neither the spirit nor the letter of the above guidelines, even though it may have approached the line in places. The "father from hell" and "no refuge but the grave" comments were better left unsaid, but we cannot say that the district court abused its discretion in finding that they were not prejudicial under these circumstances. Similarly, asking the jury to hold the appellant responsible for the crime because the "evidence shows you he is guilty," is not the same as telling the jury that it has a duty to convict the defendant. And despite the guidelines set forth above, it is too much to expect that a certain amount of hyperbole does not find itself into a prosecutor's closing argument in a death penalty case. So long as that hyperbole is fairly grounded in the evidence and does not violate one of the specific rules set forth above, it does not constitute reversible error.

### CONCLUSION

[¶ 75] This crime occurred in a location that is not part of the diminished Wind River Indian Reservation—a location that is no longer "Indian country" under guiding federal precedent. Therefore, the State of Wyoming had jurisdiction to pursue the criminal charge. It was error for the district court to instruct the jury as to common law parental duties that are not encompassed within the charged crime. The error was harmless beyond a reasonable doubt, however, because the completed verdict form reveals juror unanimity as to the appellant's guilt on all of the theories properly alleged under the statutes. Nevertheless, the Judgment and Sentence must be amended to reflect the fact that only one charge was brought, that the appellant was bound over and arraigned and pled to only one charge, and that he was, therefore, only convicted of one charge. Finally, the State's rebuttal closing argument did not constitute prosecutorial misconduct in that nothing said therein was unfairly prejudicial so as to deprive the appellant of his right to a fair trial or otherwise impinge upon his substantial rights.

[¶ 76] Affirmed, but remanded to the district court for amendment of the Judgment and Sentence to reflect conviction of the appellant on only one count of felony murder resulting from child abuse.