Andrew John **YELLOWBEAR,**
**Jr., Petitioner,**

v.

**WYOMING ATTORNEY GENERAL**
**and Fremont County Sheriff, Jack**
**"Skip" Hornecker, Respondents.**

**Case No. 06–CV–082–B.**

United States District Court,
D. Wyoming.

July 23, 2009.

Barry A. Bachrach, Bachfuch Law Office, Leicester, MA, Timothy C. Kingston, Graves Miller & Kingston, Cheyenne, WY, W. Keith Goody, Cougar, WA, for Petitioner.

David L. Delicath, Meri V. Ramsey, Wyoming Attorney General's Office, Cheyenne, WY, for Respondents.

Rick L. Sollars, Western Law Associates, Lander, WY, for Amicus.

Andrew W. Baldwin, Berthenia S. Crocker, Baldwin & Crocker, Sara R. Robinson, Lander, WY, Conly J. Schulte, Monteau & Peebles, Omaha, NE, Donald R. Wharton, Walter R. Echohawk, Native American Rights Fund, Boulder, CO, Kim-

berly D. Varilek, Eastern Shoshone Tribe, Office of Attorney General, Fort Washakie, WY, for Intervenors.

ORDER DENYING PETITIONER'S MOTION FOR SUMMARY JUDGMENT ON PETITION FOR RELIEF PURSUANT TO 28 U.S.C. 2254 TO VACATE, OR SET ASIDE CONVICTION AND SENTENCE; GRANTING RESPONDENTS' CROSS–MOTION FOR SUMMARY JUDGMENT; AND DENYING PETITIONER'S PETITION FOR RELIEF PURSUANT TO 28 U.S.C. § 2254 TO VACATE, OR SET ASIDE CONVICTION AND SENTENCE

CLARENCE A. BRIMMER, District Judge.

This matter comes before the Court on Petitioner's Motion for Summary Judgment (Doc. No. 117) and Respondents' Cross–Motion for Summary Judgment (Doc. No. 122). A hearing on the motions was held on May 14, 2009, at 10:30 a.m. W. Keith Goody appeared on behalf of Petitioner, who appeared by telephone. David Delicath appeared on behalf of Respondents. Having carefully considered the submitted briefs, the materials on file, and the arguments presented at hearing, and being fully advised in the premises, the Court hereby **FINDS** and **ORDERS** the following:

## I. FACTS AND PROCEDURAL HISTORY

Petitioner Andrew Yellowbear, Jr., is an enrolled member of the Northern Arapaho Tribe, which resides on the Wind River Indian Reservation ("Reservation") along with the Eastern Shoshone Tribe. On April 1, 2006, Petitioner was convicted in Wyoming district court of two counts of felony murder and two counts of being an accessory to felony murder, all based on the physical abuse and death of his twenty-two-month-old daughter. The crime took place at 900 Forest Drive, Riverton, Wyoming. Petitioner was subsequently sentenced to life without parole on June 1, 2006. Throughout the pendency of the state court case and since his conviction, Petitioner has consistently, but unsuccessfully, argued that the State of Wyoming ("State") lacked jurisdiction over the matter on the ground that his crime occurred in "Indian country." It is Petitioner's contention that the Act of March 3, 1905, ch. 1452, 33 Stat. 1016 ("1905 Act"), which opened land (the "1905 Act area") in the Reservation to settlement by non-Indians, did not effect a diminishment of the Reservation and did not affect its Indian country status. Since the location of the home at 900 Forest Drive lies within this 1905 Act Area, Petitioner argues that his crime took place in Indian country and the State accordingly lacks jurisdiction. Instead, according to Petitioner, jurisdiction over his crime rests exclusively with the federal government.

Prior to trial, Petitioner unsuccessfully explored several avenues to have the case dismissed on the grounds that the State lacked jurisdiction over his alleged crime. He first raised the claim in a 28 U.S.C. § 2254 petition for a writ of habeas corpus to this Court on September 2, 2004. *Yellowbear v. Wyo. Att'y Gen.*, No. 04–CV–243–B (D.Wyo. filed Sept. 2, 2004). This Court dismissed the petition on the grounds that Petitioner was a pre-conviction prisoner, he had not exhausted his claims, and relief pursuant to 28 U.S.C. § 2241 was unavailable on the grounds of non-exhaustion and *Younger* abstention. The Tenth Circuit Court of Appeals declined to grant a certificate of appealability. In November 2004, Petitioner unsuccessfully challenged the State's jurisdiction in Wyoming circuit court before the case was bound over to the district court for

trial. Petitioner challenged jurisdiction again in November 2005, when he filed a Motion to Dismiss, which was denied by the district court after briefing and oral argument. Petitioner then sought a writ of review and a stay of proceedings from the Wyoming Supreme Court, both of which the court denied.

Petitioner also looked to the Shoshone and Arapaho Tribal Court for relief in the weeks before and during trial. On March 16, 2006, that court granted Petitioner's Motion for Declaratory Judgment and declared that the State was without criminal jurisdiction over Indians in the City of Riverton. No others beside Petitioner and counsel for the Northern Arapaho Tribe appeared at the hearing on jurisdiction, although the Fremont County Attorney, the Deputy County Attorney for Hot Springs County, the state judge in the underlying case, and the Shoshone Business Council were given notice. On March 29, 2006, the tribal court declared as void and rescinded the July 2004 Order of Extradition of Petitioner from the Reservation to the State. Petitioner, appearing pro se, was the only party in attendance although the Fremont County Sheriff's Office was given notice of the hearing. Thus, at neither of these hearings was any opposition made to Petitioner's motions. Despite these efforts, the state trial proceeded.

On March 27, 2006, during trial, Petitioner again sought relief from this Court by filing the present case pursuant to 28 U.S.C. § 2241. Petitioner was subsequently convicted and sentenced. This Court again denied the petition on exhaustion and abstention grounds and Petitioner appealed to the Tenth Circuit. While the appeal was pending, the Wyoming Supreme Court unanimously affirmed the conviction. *Yellowbear v. Wyoming,* 174 P.3d 1270 (Wyo.2008). As a result, the Tenth Circuit Court of Appeals deter-mined that Petitioner had exhausted his claims and that abstention concerns no longer existed. The Court of Appeals reversed and remanded the case, permitting Petitioner to recharacterize his § 2241 action as a § 2254 petition, which he has now done. Accordingly, what is now before this Court is a petition for writ of habeas corpus brought under 28 U.S.C. § 2254.

Petitioner's first and remaining claim (Claims 2 and 3 were voluntarily dismissed) is that the State lacks jurisdiction over the crime for which he was convicted, and that as a result, the state court decision regarding jurisdiction was contrary to or an unreasonable application of clearly established federal law under 28 U.S.C. § 2254(d)(1). Petitioner contends that the Wyoming Supreme Court "erroneously" determined the question of whether his crime occurred in Indian country and whether the State lacked jurisdiction. (Doc. No. 78, Pet. for Relief ¶ 15.)

Following a motion by Respondents, this Court ruled that rather than the *de novo* review requested by Petitioner, the more limited review available under 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), was the proper standard of review in this matter because the underlying state case was adjudicated on the merits. (Doc. No. 124, Order Feb. 3, 2009 at 7.) The Court also held that the issues raised in this matter present predominantly legal questions and do not require an evidentiary hearing as contemplated under the statute. (*Id.* at 9.) Following the Court's order and while he was in the process of being appointed new counsel, Petitioner, acting pro se, filed his Motion for Summary Judgment. Respondents filed a Cross–Motion for Summary Judgment coupled with their response. At an April 2, 2009 scheduling conference, the parties agreed that no facts are in dispute and that this case was ready for decision

through resolution of the pending motions. (Doc. No. 134, Order on Sched. Conf.)

## II. STANDARD OF REVIEW ON SUMMARY JUDGMENT

Summary judgment is available "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The parties in this matter agree that there are no material issues of fact.[1] What is left for the Court to decide is which party is entitled to judgment as a matter of law. In other words, the Court must decide whether the underlying petition for relief under § 2254 is to be granted or denied.

## III. STANDARD OF REVIEW IN A 28 U.S.C. § 2254 PETITION

■ Although Petitioner's underlying legal challenge presents significant and difficult questions of law and sovereignty, his challenge comes in the form of collateral review, the scope of which is dictated and limited by the AEDPA-amended 28 U.S.C. § 2254(d)(1). *See Burgess v. Watters*, 467 F.3d 676, 681 (7th Cir.2006) (reviewing under the AEPDA standard of review an Indian's claims that the state court lacked jurisdiction under Public Law 280 to conduct involuntary civil commitment proceedings). *Cf. Murphy v. Sirmons*, 497 F.Supp.2d 1257 (E.D.Okla.2007) (reviewed under AEDPA standard of review the claim that crime occurred in Indian country and state court lacked juris-

diction). This Court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The present Petition challenges Petitioner's custody as being in violation of a treaty and subsequent law of the United States. Relevantly, such an application for a writ of habeas corpus:

> shall not be granted with respect to any claim that was adjudicated on the merits in State court: proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

28 U.S.C. § 2254(d)(1). Where a claim was adjudicated by the state court on the merits, as here, the AEDPA amendments to § 2254(d)(1) constrain the review a federal habeas court may undertake and shift the focus from a *de novo* review of the underlying claim to a more limited review of the state court's decision. *Jackson v. Coalter*, 337 F.3d 74, 83 (1st Cir.2003). *See also Battenfield v. Gibson*, 236 F.3d 1215, 1220 (10th Cir.2001) (noting that the available review hinges on the treatment of the claim by the state court or, in other words, whether the claim was decided on the merits or not).

■ The threshold question is whether there exists clearly established federal

---

1. The Court confirmed this with the parties at the April 2, 2009 scheduling conference, at which the parties both agreed that Petitioner is an enrolled member of the Northern Arapaho Tribe. The parties also had previously filed, at the Court's request, a stipulation on March 9, 2009, of the location of the underlying crime. That stipulation provides the legal description of 900 Forest Drive, Riverton, Wy-

oming, as "T. 1 N, R. 4 E, Sec. 26, NWSW, of the Wind River Meridian (WRM), Wind River Village Addition, Lots 1, 2 and 3" and that the address is "in Fremont County," and is "north of the Big Wind River and west of the Big Popo–Agie River." (Doc. No. 131, Stipulation Regarding the Legal Description of 900 Forest Drive in Riverton, Wyoming.)

law governing the decision which Petitioner has challenged. *Lockyer v. Andrade*, 538 U.S. 63, 71, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003). The absence of clearly established federal law is analytically dispositive in a § 2254(d)(1) analysis and requires denial of the petition. *House v. Hatch*, 527 F.3d 1010, 1017 (10th Cir.2008) (citing *Carey v. Musladin*, 549 U.S. 70, 127 S.Ct. 649, 166 L.Ed.2d 482 (2006)). "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to the holdings, as opposed to the dicta of the Supreme Court as of the time of the relevant state-court decision. *Williams v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Similarly, the Supreme Court's denial of certiorari is not governing precedent.[2] *Robinson v. Ignacio*, 360 F.3d 1044, 1057 n. 6 (9th Cir.2004) (citing *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (quoting *United States v. Carver*, 260 U.S. 482, 490, 43 S.Ct. 181, 67 L.Ed. 361 (1923), for the statement that "denial of a writ of certiorari imports no expression of opinion upon the merits of the case")). Thus, it is only Supreme Court holdings against which a state court decision may be tested. Additionally, clearly established federal law may not be drawn from "general principles teased from precedent" but rather must be "construed narrowly and consist only of something akin to on-point holdings." *House*, 527 F.3d at 1015–16 (citing *Musladin*, 549 U.S. 70, 127 S.Ct. 649, and noting that pre-Musladin decisions were more likely to discern a general legal principle from precedent even in the absence of a definite holding on point).

■■■■■ Next, the AEDPA provides two separate standards of review of a state court decision: (1) whether a state court decision was "contrary to" clearly established federal law, or (2) whether the decision was an "unreasonable application" of clearly established federal law. *Williams*, 529 U.S. at 406, 412–13, 120 S.Ct. 1495. A decision which is "contrary to" clearly established federal law is one in which the state court "[1] arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or ... [2] decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Id.* at 412, 120 S.Ct. 1495. In other words, application of the correct legal rule to the facts of a prisoner's case is not contrary to clearly established federal law, regardless of whether the reviewing federal court might reach a different result in applying the same rule to the facts. *Id.* at 406, 120 S.Ct. 1495. Such a case is instead governed by the "unreasonable application" standard.

■■■■■ A decision which results in an "unreasonable application" of clearly established federal law is one in which "the state court identifies the correct governing legal principle: from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case."[3] *Id.* at 413, 120 S.Ct.

---

**2.** Petitioner fleetingly asserted, but never fully explained or supported the argument that the State is collaterally estopped from arguing that Riverton is Indian country on the grounds that the State lost that argument in *In re General Adjudication of All Rights to Use Water in the Big Horn River System*, 753 P.2d 76, 119–135 (Wyo.1988) [hereinafter *"Big Horn I"*]. (Summ. J. Hr'g Tr. 27:10–27:14, May 14, 2009.) Setting aside whether this

argument has merit, the Court notes that the Supreme Court's denial of the State's petition for writ of certiorari on a potentially relevant claim, *Wyoming v. United States*, 488 U.S. 1040, 109 S.Ct. 863, 102 L.Ed.2d 987 (1989) (granting writ limited to a separate question), has no bearing on the applicable federal law in this case.

**3.** An unreasonable application of clearly established federal law may also occur "if the

1495. The inquiry asks "whether the state court's application of clearly established federal law was *objectively unreasonable,*" not whether it was incorrect. *Id.* at 409–10, 120 S.Ct. 1495 (emphasis added). "[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, the application must also be unreasonable." *Id.* at 411, 120 S.Ct. 1495. The Tenth Circuit has described "objectively unreasonable" decisions as falling somewhere between decisions which are clearly erroneous and decisions which are unreasonable to all jurists. *Maynard v. Boone,* 468 F.3d 665, 670 (10th Cir.2006). Thus, a state court decision is reasonable even if it is clearly erroneous, but it will not survive if it is unreasonable to most reasonable jurists:

> [O]nly the most serious misapplications of Supreme Court precedent will be a basis for relief under § 2254. In our view, a decision is "objectively unreasonable" when most reasonable jurists exercising their independent judgment would conclude the state court misapplied Supreme Court law. It is not enough that the decision is clearly wrong or that the reviewing court would have reached a contrary decision.... [T]he: state court decision must be "at such tension with governing U.S. Supreme Court precedents, or so inadequately supported by the record, or so arbitrary as to be unreasonable."

*Id.* at 671 (quoting *Badelle v. Correll,* 452 F.3d 648, 655 (7th Cir.2006)).

 Importantly, "evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more lee-

way courts have in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado,* 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). Thus, a "doubly deferential judicial review" applies to a state court application of a general standard set forth by the Supreme Court. *Knowles v. Mirzayance,* —— U.S. ——, 129 S.Ct. 1411, 1420, 173 L.Ed.2d 251 (2009) (holding that this doubly deferential review applied to a Strickland claim evaluated under the § 2254(d)(1) standard). Whereas application of specific rules may be plainly correct or incorrect, the application of more general rules to the facts of a particular case is given more leeway in terms of determining reasonableness. *Noling v. Bradshaw,* No. 5:04 CV 1232, 2008 WL 320531, at *14, 2008 U.S. Dist. LEXIS 7650, at *35 (N.D.Ohio Jan. 31, 2008) (citing *Yarborough,* 541 U.S. at 664, 124 S.Ct. 2140).

This Court will first determine the threshold question of what constitutes the applicable "clearly established Federal law" in this matter, and will then determine whether the Wyoming Supreme Court's decision affirming the State's jurisdiction over Petitioner's crime is "contrary to, or involved an unreasonable application of" that law. The Court will not reach the question of whether the Wyoming Supreme Court erred. *Cf. Lockyer v. Andrade,* 538 U.S. 63, 71–73, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003) (holding that the AEDPA does not require a federal habeas court to adopt any one methodology in deciding the question and disagreeing with the Ninth Circuit requirement that a *de novo* review of the state court decision must be conducted before applying the AEDPA standard of review; instead, the Court stated, "we do not reach the ques-

state court either unreasonably extends, or unreasonably refuses to extend, a legal principle from Supreme Court precedent to a new

context where it should apply." *House,* 527 F.3d at 1018. However, Petitioner does not make this argument here.

tion whether the state court erred and instead focus solely on whether § 2254(d) forecloses habeas relief" on the petitioner's claim). In other words, this Court should not and will not independently decide the merits of the underlying legal question answered by the Wyoming Supreme Court. *Cf. Snow v. Sirmons*, 474 F.3d 693, 696 (10th Cir.2007) (the § 2254(d)(1) standard, although not requiring "abject deference," "prohibits us from substituting our own judgment for that of the state court" (internal quotations omitted)). Rather, this Court will carefully review the Wyoming Supreme Court's application of clearly established federal law.

## IV. ANALYSIS

### a. Clearly established federal law

The federal government has jurisdiction over Petitioner's crime if it was committed in Indian country, as defined by 18 U.S.C. § 1151.[4] Relevantly, 18 U.S.C. § 1151 defines Indian country as "all lands within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation." 18 U.S.C. § 1151(a). Since the crime scene at issue is located within the 1905 Act area, its Indian country status, and therefore the State's jurisdiction, turns upon whether the 1905 Act terminated the Reservation status of the 1905 Act area.

The 1905 Act served to codify, with some amendments, an April 21, 1904 agreement referred to as the Second McLaughlin Agreement, which was entered into between the Eastern Shoshone Tribe, the Northern Arapaho Tribe, and James McLaughlin, the United States Indian Inspector for the Wind River Indian Reservation. The Act's operative language states:

> The said Indians belonging on the Shoshone or Wind River Reservation, Wyoming, for the consideration hereinafter named, do hereby cede, grant, and relinquish to the United States, all right, title, and interest which they may have to all the lands embraced within the said reservation, except [certain described lands].

1905 Act, art. I. Other provisions of the Act. are cited by the parties and are relevant to the diminishment analysis. However, the Court will not reprint the entire Act here, as it is reprinted in its entirety in the Wyoming Supreme Court's opinion in *Yellowbear. Yellowbear*, 174 P.3d at 1274–78.

As both parties have acknowledged, a well-recognized body of Supreme Court case law has developed the case-by-case analysis to be conducted in determining whether a surplus land act, such as the one here, diminished[5] a reservation as opposed to just opening the reservation to non-Indian settlement. The seven cases identi-

---

4. Reference has been made to the Indian Country Crimes Act, 18 U.S.C. § 1152, as the applicable criminal statute governing Petitioner's crime if it was committed in Indian country. (Doc. 122, Resp'ts' Resp. and Cross–Mot. for Summ. J. 9.) However, the Court is not certain that the ICCA governs as it reaches only interracial crimes. Petitioner's daughter was an enrolled member of the Northern Arapaho Tribe. *Yellowbear*, 174 P.3d at 1273. Instead, it appears that the Indian Major Crimes Act, 18 U.S.C. § 1153 would govern the crime here. In either case,

jurisdiction exists only if the crime was committed in Indian country.

5. As a point of clarification, references to diminishment and disestablishment in this Order both refer to termination of reservation status. Generally, diminishment occurs when only a portion of a reservation's lands lose reservation status, while disestablishment refers to the termination of an entire reservation. *See Yankton Sioux Tribe v. Gaffey*, 188 F.3d 1010, 1017 (8th Cir.1999) (making the distinction).

fied by the parties, and by the Wyoming Supreme Court, as controlling are: Seymour v. Superintendent of Washington State Penitentiary, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962); Mattz v. Arnett, 412 U.S. 481, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973); DeCoteau v. District County Court for the Tenth Judicial District, 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975); Rosebud Sioux Tribe v. Kneip, 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977); Solem v. Bartlett, 465 U.S. 463, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984); Hagen v. Utah, 510 U.S. 399, 114 S.Ct. 958, 127 L.Ed.2d 252 (1994); South Dakota v. Yankton Sioux Tribe, 522 U.S. 329, 118 S.Ct. 789, 139 L.Ed.2d 773 (1998). As the Court in Solem stated, "Our precedents in the area have established a fairly clean analytical structure for distinguishing those surplus land acts that diminished reservations from those acts that simply offered non-Indians the opportunity to purchase land within established reservation boundaries." [6] Solem, 465 U.S. at 470, 104 S.Ct. 1161. As explained in Solem,

> The first and governing principle is that only Congress can divest a reservation of its land and diminish its boundaries. Once a block of land is set aside for an Indian Reservation and no matter what happens to the title of individual plots within the area, the entire block retains its reservation status until Congress explicitly indicates otherwise.... Diminishment, moreover, will not be lightly inferred.

Id. at 470, 104 S.Ct. 1161. Thus, determining congressional intent is the focus of the inquiry. Mattz, 412 U.S. at 505, 93 S.Ct. 2245. What has emerged to guide the finding of congressional intent is a three-part analytical structure.

First, and most probative of congressional intent, is the statutory language used to open the Indian lands, which must "clearly evince" an "intent to change boundaries" before diminishment will be found. Solem, 465 U.S. at 470, 104 S.Ct. 1161 (quoting Rosebud, 430 U.S. at 615, 97 S.Ct. 1361). There is no precise formula for language of cession. DeCoteau, 420 U.S. at 445–46, 439 n. 22, 95 S.Ct. 1082 (finding the operative language, "cede, sell, relinquish, and convey," "precisely suited" to the purpose of diminishment and finding it "virtually indistinguishable" from several other sum certain cession agreements ratified in the same act). If, in addition to this language of cession, there is also included an unconditional commitment from Congress to compensate the tribe for the land, "there is almost an insurmountable presumption that Congress meant for the tribe's reservation to be diminished." Solem, 465 U.S. at 470–71, 104 S.Ct. 1161. However, lack of such a provision for a sum certain "does not lead to the contrary conclusion." Hagen, 510 U.S. at 412, 114 S.Ct. 958 (noting that the statutes in Rosebud did not provide for a sum certain payment yet the Court found diminishment). On the other hand, "reservation status may survive the mere opening of a reservation to settlement, even when the moneys paid for the land by the settlers are placed in trust by the Government for

---

**6.** The extensive case-by-case analysis developed by the Court results from the recognition that at the time these surplus land acts were passed, "Congress did not view the distinction between acquiring Indian property and assuming jurisdiction over Indian territory as a critical one, in part because the notion that reservation status of Indian lands might not be coextensive with tribal ownership was unfamiliar and in part because Congress then assumed that the reservation system would fade over time. Given this expectation, Congress naturally failed to be meticulous in clarifying whether a particular piece of legislation formally sliced a certain parcel of land off one reservation." Yankton Sioux, 522 U.S. at 343, 118 S.Ct. 789 (internal quotations and citations omitted).

the Indians' benefit." *DeCoteau,* 420 U.S. at 444, 95 S.Ct. 1082. Although the language of the statute is most probative of congressional intent, "explicit language of cession and unconditional compensation are not prerequisites for a finding of diminishment." *Solem,* 465 U.S. at 471, 104 S.Ct. 1161 (citing *Rosebud* as an example).

██ Second, in addition to the express language of an act, congressional intent may also be clear from the historical context of the act, namely the surrounding circumstances and legislative history. *Mattz,* 412 U.S. at 505, 93 S.Ct. 2245. "Even in the absence of a clear expression of congressional purpose in the text of a surplus land Act, unequivocal evidence derived from the surrounding circumstances may support the conclusion that a reservation has been diminished." *Yankton,* 522 U.S. at 351, 118 S.Ct. 789. The manner of negotiations and the tenor of legislative reports are important in revealing whether there was a "widely-held, contemporaneous understanding that the affected reservation would shrink as a result of the proposed legislation," creating an inference that Congress shared this understanding. *Solem,* 465 U.S. at 471, 104 S.Ct. 1161.

██ Third, although relied upon "to a lesser extent," is the "subsequent treatment of the area in question and the pattern of settlement there." *Yankton,* 522 U.S. at 344, 118 S.Ct. 789. In this context, treatment of the affected area by various governmental bodies, such as Congress, the Bureau of Indian Affairs, and local judicial authorities, "has some evidentiary value." *Solem,* 465 U.S. at 471, 104 S.Ct. 1161. The Court has also recognized that *de facto,* if not *de jure,* diminishment may have occurred when non-Indian settlers have settled the opened lands and the lands have lost their Indian character. *Id.* The Court has viewed this demographic history as an additional clue as to Congress's expectation for the opened land. *Id.* The Court acknowledged that reliance on this sort of evidence is potentially problematic but that it is a necessary expedient in the context of surplus land acts where Congress was not focused on the diminishment issue. *Id.* at 472 n. 13, 104 S.Ct. 1161.

**b. The Wyoming Supreme Court decision in *Yellowbear***

It is more than fair to characterize the Wyoming Supreme Court's decision in Petitioner's direct appeal as a thorough review and application of the history of the Reservation, the 1905 Act, and the controlling Supreme Court precedent. The Court recounted the relevant history of the Reservation's establishment. It recognized that development on the Reservation followed the national shift in Indian policy after the passage of the General Allotment Act of 1887 permitted allotment of land to Indians and sale of surplus land to non-Indians. *Id.* at 1274. The 1905 Act, a surplus land act, ratified the 1904 treaty negotiated by Inspector McLaughlin and the Reservation's tribes. *Id.* After reprinting the Act in its entirety in the opinion, the Court described the relevant facts and holdings of the seven United States Supreme Court cases described above and the "analytical construct" they created. *Id.* at 1278–82. The Court then applied this analytical construct to the 1905 Act.

First, the Wyoming Supreme Court determined that the language of the 1905 Act itself demonstrates that Congress intended diminishment. It concluded that the language, "cede, grant, and relinquish to the United States all right and title, and interest which they may have," is indistinguishable from the language of *DeCoteau* described above. *Id.* at 1282. The Court next noted the frequent reference in the Act to "diminished reserve" or "diminished

reservation." *Id.* The Court remarked that the appropriation of $35,000 to survey the boundaries of the "diminished reservation" would not seem necessary if diminishment had not occurred. The Court then remarked that the government's payment obligations included certain appropriations, including $85,000 for per capita payments, $35,000 for surveying, and $25,000 for an irrigation system "on the diminished reservation." *Id.* The Court acknowledged that these payment obligations are not as clearly definitive of diminishment as other language in the Act, noting that some payments were to come out of sales proceeds and could not be classified as a "sum certain."

Second, the Wyoming Supreme Court assessed the events and circumstances surrounding the 1905 Act, referencing both the majority and dissenting opinions in *Big Horn I.* According to the Yellowbear court, both the majority and the dissent in *Big Horn I* agreed that the Reservation had been diminished. *Yellowbear,* 174 P.3d at 1283 (citing *Big Horn I,* 753 P.2d at 84, 112, 114, 119–35). The dissent in *Big Horn I* further provided a detailed and lengthy discussion of the statutory history of the Reservation and the development and legislative history of the final 1905 Act, which began with an 1891 agreement not ultimately ratified by Congress. *Big Horn I,* 753 P.2d at 123–129 (Thomas, J., dissenting). The *Big Horn I* dissent further detailed the council meeting held between McLaughlin and tribal representatives, at which the representatives are recorded as acknowledging that the agree-

ment would result in parting forever with a portion of their reservation. *Big Horn I,* 753 P.2d at 127 (Thomas, J., dissenting) (citing McLaughlin Letters (Microfilm Roll 26 at 32, 35, and 40)).[7] The Yellowbear court also referenced *Blackburn v. State,* 357 P.2d 174, 176–78 (Wyo.1960), for its conclusion that diminishment had occurred, noting that although the analysis there does not follow the analysis required here, the result would have been the same had the 1905 Act been considered. *Yellowbear,* 174 P.3d at 1283. The Court further pointed to *State v. Moss,* 471 P.2d 333 (Wyo.1970), with nearly identical facts to the present case, in which the court concluded that the land owned by a non-Indian and annexed into the City of Riverton had been placed by Congress outside the Reservation. *Yellowbear,* 174 P.3d at 1283 (citing *Moss,* 471 P.2d at 339).

Third, the Wyoming Supreme Court examined the events subsequent to the passage of the 1905 Act, including demographic factors. The court found that the record evidence here is,

> notably similar to the evidence in *Yankton Sioux,* 522 U.S. at 356–57, 118 S.Ct. at 804–05, and in *Hagen,* 510 U.S. at 420–21, 114 S.Ct. at 970, where the Supreme Court found intent to diminish the reservation: (1) the seat of tribal government on the Wind River Indian Reservation is not within the ceded lands; (2) about 92% of the population of the City of Riverton is non-Indian; and (3) the City of Riverton and State of Wyoming provide sanitation, street

---

**7.** The *Big Horn I* dissent further discussed in detail subsequent legislative and executive history as further support for the conclusion that the congressional intent and understanding was to diminish the Reservation. *Big Horn I,* 753 P.2d at 129–32 (Thomas, J., dissenting). Additionally, the dissent noted the significance of the federal government's acquiescence in the prior decisions of the Wyo-

ming Supreme Court finding diminishment and upholding state jurisdiction over the 1905 Act. *Id.* at 132–33. These two points are relevant to the third part of the diminishment analysis discussed below, but this portion of the discussion is not explicitly referenced by the *Yellowbear* court under this prong of its analysis.

maintenance, water and sewer service, planning and zoning, and law enforcement.

*Id.* at 1283. The court noted several subsequent events indicating diminishment. Congress passed an act in 1907 that referenced the ceded portion of the reservation as "lands formerly embraced in the Wind River or Shoshone Indian Reservation." *Id.* (citing Act of Jan. 17, 1907, ch. 151, 34 Stat. 849). Also, in a suit by the Shoshone Tribe against the United States, the Court of Claims referenced the 1905 Act area as the "diminished reservation" and included in its decision a map identifying the area north of the Big Wind River as "ceded by agreement of April 21, 1904" and the area south of the Big Wind River as the "present Wind River or Shoshone Indian Reservation." *Id.* at 1283 (citing *Shoshone Tribe of Indians of Wind River Reservation in Wyoming v. United States,* 82 Ct. Cl. 23, 25, 30 (1935)). In the same case, on cross-petitions for certiorari, the United States Supreme Court also used the term "diminished reservation." *Id.* at 1284 (citing *Shoshone Tribe of Indians of Wind River Reservation in Wyoming v. United States,* 299 U.S. 476, 489, 57 S.Ct. 244, 81 L.Ed. 360 (1937), *aff'd* 304 U.S. 111, 58 S.Ct. 794, 82 L.Ed. 1213 (1938)). And finally, the Wyoming Supreme Court noted the restoration in 1944 of certain lands to the reservation as a more direct example of congressional intent to diminish the Reservation. *Id.* It quoted from the Federal Register that the lands,

> are hereby restored to tribal ownership for the use and benefit of the Shoshone–Arapahoe Tribes of Indians of the Wind River Reservation, Wyoming, and are added to and made a part of the existing Wind River Reservation, subject to any valid existing rights.

*Id.* (quoting 9 Fed.Reg. 9746–9754 (Aug. 10, 1944)). The Court concluded that "lands that remained part of a reservation would not have to be added to it." *Id.* at 1284.

After making the requisite inquiries per the guidance of the United States Supreme Court, the Wyoming Supreme Court concluded:

> We conclude from all these factors that it was the intent of Congress in passing the 1905 Act to diminish the Wind River Indian Reservation and to remove from it the lands described as "ceded, granted, and relinquished" thereunder. While the City of Riverton may be located on lands that at one time were within the external boundaries of the reservation, those lands are no longer part of the reservation, and are not "Indian country." Therefore, the State of Wyoming has jurisdiction in this criminal case.

**c. Adequacy of the decision under § 2254(d)(1)**

**1. "Contrary to"**

The Court finds, and it does not appear that Petitioner argues otherwise, that the Wyoming Supreme Court's decision is not contrary to clearly established federal law. As counsel for Petitioner acknowledged at oral argument, the Wyoming Supreme Court appropriately identified the applicable Supreme Court cases in its analysis. (Hr'g Tr. 02:17–03:12.) Therefore, under the § 2254(d)(1) standard of review, this Court cannot find that the state court decision was contrary to Supreme Court holdings. *Williams,* 529 U.S. at 406, 120 S.Ct. 1495. This is especially so in this matter where the established Supreme Court law is a framework requiring a case-by-case analysis rather than application of a distinct rule of law.

**2. "Unreasonable application"**

█ Petitioner has not demonstrated, and the Court does not find, that the Wyoming Supreme Court's decision amounts to

an unreasonable application of clearly established federal law. As discussed above, the standard of review guiding this Court is highly deferential. Even a clearly erroneous decision does not warrant the granting of a petition. Moreover, as the review requires the case-specific application of an analytical framework rather than a specific, concise rule of law, the court's application of the law is given a "doubly deferential judicial review." *See Knowles*, 129 S.Ct. at 1420; *Yarborough*, 541 U.S. at 664, 124 S.Ct. 2140. Despite the tremendous deference available, this more deferential review is not necessary to find that the decision here was not objectively unreasonable. Moreover, one would be hard-pressed to say the decision described above was even clearly erroneous. As counsel for Petitioner aptly stated at the hearing, "I think that both sides certainly can make a cogent argument based upon the Supreme Court cases.... I think we can argue all day long about the meaning of that treaty." (Hr'g Tr. 40:20–40:22.) This being the case, the Court cannot but find that the Petition must be denied.

The Court will address in turn the arguments gleaned from Petitioner's briefs and oral argument. Petitioner spent much of his argument on the underlying merits of the question of diminishment. However, the Court will address those arguments made by Petitioner which arguably challenge the reasonableness of the Wyoming Supreme Court's decision.

■■■■■ As for identification of the principles governing diminishment cases, Petitioner contends that the Wyoming Supreme Court did not mention certain principles in its decision, namely that (1)

Congress must explicitly indicate disestablishment of a reservation,[8] and (2) any ambiguity must be resolved in favor of the Indians. (Hr'g Tr. 22:17–22:18, 22:20–22:24, 23:09–23:13.) Petitioner further argued that the court "picked and chose ... the principles that were to be applied." (Hr'g Tr. 04:23–04:24.) However, upon review of the Wyoming Supreme Court's decision, it is apparent that the court was cognizant of these principles. *See Yellowbear*, 174 P.3d at 1280–81 (quoting *Solem*, 465 U.S. at 470–72, 104 S.Ct. 1161, for the principles that congressional intent must be explicitly indicated, that diminishment will not be lightly inferred, and that where neither an act or the legislative history are compelling, a court is bound by the traditional solicitude for Indian tribes and must find no diminishment). While the court did not in so many words recite the principle of resolving ambiguities in favor of the tribe, Petitioner has not pointed to and the Court cannot find any example here where ambiguities were resolved against the tribe. The only argument along these lines raised by Petitioner that the Court can perceive is that the Wyoming Supreme Court acknowledged that the government's payment obligations under the 1905 Act are not so clear as to the sum certain, yet it still found intent to diminish. (Hr'g Tr. 13:01–13:12.) However, as the Supreme Court has stated, the lack of a provision for sum certain does not lead to the conclusion that diminishment was not intended. *Hagen*, 510 U.S. at 412, 114 S.Ct. 958. *See Solem*, 465 U.S. at 471, 104 S.Ct. 1161 (holding that explicit language of cession and sum certain are not pre-

---

8. While explicit or express statutory language of total surrender and unconditional compensation is the most probative of congressional intent, "explicit language of cession and unconditional compensation are not prerequisites for a finding of diminishment." *Solem*, 465 U.S. at 470–71, 104 S.Ct. 1161. The Supreme Court has been willing to infer intent to diminish from the events surrounding the passage of a surplus land act. *Id.* at 471, 104 S.Ct. 1161.

requisites to finding diminishment); *Rosebud*, 430 U.S. at 596, 596 n. 18, 598 n. 20, 97 S.Ct. 1361 (finding diminishment despite no sum certain). Moreover, the court found that while the payments were to come out of the proceeds of the sale, Congress still made immediate appropriations for some of the promised payments in advance of the receipt of sale money. *See Yellowbear*, 174 P.3d at 1278, 1282 (analyzing Article IX, sec. 3 of the 1905 Act). This indicates a finding of something more akin to a sum certain, if that is in fact what the court meant to infer.

In addition to the concerns over the lack of a sum certain in the treaty, Petitioner argues that the Wyoming Supreme Court's review of the express treaty language was inadequate in other ways. Petitioner emphasizes the fact that the 1905 Act lacks the word "convey" in its operative language.[9] However, it was not an unreasonable application of federal law for the Wyoming Supreme Court to not place emphasis on this fact, especially where the Supreme Court has expressly stated that there is no magic formula of words from which diminishment must be found. *Hagen*, 510 U.S. at 411, 114 S.Ct. 958. *Hagen* itself did not contain "convey" in its operative language, much less any clear cession language at all, and the finding of diminishment there turned on the language returning the lands to the "public domain." *Id.* at 412–14, 114 S.Ct. 958. Furthermore, the cases in which cession language was found to be "precisely suited" to a finding of diminishment do not place greater emphasis on the existence of any one word in the operative language. *See DeCoteau*, 420 U.S. at 447, 95 S.Ct. 1082; *Rosebud*, 430 U.S. at 591–92, 597, 97 S.Ct. 1361 (finding diminishment despite absence of "convey"); *Yankton*, 522 U.S.

at 344, 118 S.Ct. 789 (saying that the "cession" plus the "sum certain" language is precisely suited). Moreover, in *DeCoteau*, the Court referenced seven other treaties with cession language that similarly effected diminishment, and six of those treaties did not contain the word "convey" in the operative language. Thus, under the circumstances here, the Wyoming Supreme Court's interpretation of the 1905 Act was not an unreasonable application of clearly established federal law.

Petitioner also contends that the court disregarded the language in the treaty providing that the United States was to act as trustee for the Indians in disposing of the ceded lands and was not obligated to purchase, otherwise dispose of, or guaranty purchasers for the land. (Doc. 125, Pet.'r Resp. to Resp'ts' Cross Mot. 16; Hr'g Tr. 11:14–13:12.) However, the Supreme Court found diminishment in *Rosebud* where the language of the act effecting diminishment contained similar language that "the United States did not guarantee to find purchasers but agreed only to 'act as trustee for said Indians to dispose of said lands.'" *Rosebud*, 430 U.S. at 597, 97 S.Ct. 1361. Additionally, as discussed next, the fact that a beneficial interest is retained is not necessarily indicative of retention of reservation status. In light of this precedent, it is not unreasonable to find diminishment where such trust language exists.

Petitioner further cites to *Ash Sheep Co. v. United States*, 252 U.S. 159, 40 S.Ct. 241, 64 L.Ed. 507 (1920), with operative statutory language nearly identical to that of the 1905 Act, as supportive of his position. The language in the *Ash Sheep* act does present nearly identical phrasing: the Indians of the Crow Indian Reservation

---

9. Although not in the operative language, the very next Article in the Act did contain the word "convey," as was pointed out by the dissent in *Big Horn I*. 753 P.2d at 135 n. 6 (Thomas, J., dissenting).

"ceded, granted and relinquished" to the United States all of their "right, title and interest." *Id.* at 164, 40 S.Ct. 241 (quoting Act of April 27, 1905, ch. 1624, 33 Stat. 352, 353). However, *Ash Sheep* is unhelpful to the present diminishment analysis. *Ash Sheep* involved not the question of disestablishment, but rather the different question of whether certain ceded lands became "public lands" or remained "Indian lands" for the purposes of a separate statute and due to a beneficial interest retained by the Indians by virtue of the trust relationship established in the agreement with the United States. *Id.* at 166, 40 S.Ct. 241. As the Court stated in *Rosebud*, "The fact that a beneficial interest is retained does not erode the scope and effect of the cession made, or preserve to the reservation its original size, shape, and boundaries.... The question of whether lands become 'public lands' under [*Minnesota v.*] *Hitchcock* [, 185 U.S. 373, 22 S.Ct. 650, 46 L.Ed. 954 (1902),] and *Ash Sheep,* is therefore, logically separate from a question of disestablishment." *Rosebud*, 430 U.S. at 601 n. 24, 97 S.Ct. 1361. *See also Solem*, 465 U.S. at 468, 104 S.Ct. 1161 (citing *Ash Sheep* as an example of the early judicial definitions of Indian lands prior to the uncoupling of reservation status from Indian ownership).

Petitioner also places much emphasis on the fact that there is no language in the 1905 Act restoring land to the "public domain." However, as with the word "convey," nowhere in these Supreme Court cases is it held that this precise language is required. It does appear in some instances, but it also is absent in other cases where diminishment did occur. *See Mattz*, 412 U.S. at 505 n. 22, 93 S.Ct. 2245 (giving three examples of clear language of express termination, two of which are without the phrase "public domain"). And, at other times, the existence of the phrase in an act was not enough to convince the Court that diminishment occurred where the particular act, read as a whole, did not show a congressional intent to diminish. *See Solem*, 465 U.S. at 475, 104 S.Ct. 1161 (stating that isolated references to "public domain" and "diminished" reservation were not enough). The Supreme Court has also suggested that the phrase might have been used where no diminishment occurred as it was not yet a term of art in Indian law when it was first used. *See id.* at 476 n. 17, 104 S.Ct. 1161 (observing that in 1908, "diminished" was not yet a term of art and may not have referred to reducing the size of a reservation and similarly, "public domain" could simply mean open to settlement).[10] *But see Hagen*, 510 U.S. at 414, 114 S.Ct. 958 (where the operative language provides for *restoration* of lands to the public domain, there is an intent to diminish).

Turning to the contemporaneous events surrounding the passage of the 1905 Act, Petitioner does not suggest that the Wyoming Supreme Court's analysis in this respect is deficient. In fact, the court reasonably applied clearly established federal law to find that events surrounding the Act, namely the legislative history and the

---

**10.** The Wyoming Supreme Court did mention the frequent use of "diminished" or variants of the word in support of express congressional intent to diminish in the 1905 Act. *Yellowbear*, 174 P.3d at 1283. While perhaps not a term of art at the time, its use is some indication of intent. *Cf. Oregon Dept. of Fish and Wildlife v. Klamath Indian Tribe*, 473 U.S. 753, 760 n. 11, 105 S.Ct. 3420, 87 L.Ed.2d 542 (1985) (noting the express reference to "diminished reservation" in support of the conclusion that the reservation was diminished). Nevertheless, the court did not rest its analysis solely on this fact. Rather, it was secondary to the operative language and in addition to other evidence of diminishment within the Act. Even were this to be considered an erroneous application of the law, this *is insufficient to find the opinion unreasonable* under the present standard of review.

relevant negotiations with the tribes all point to the conclusion that the congressional intent was for the 1905 Act to effect a diminishment of the Reservation. *Yellowbear*, 174 P.3d at 1283 (citing the detailed examination of these events by the dissent in *Big Horn I*, 753 P.2d at 119–35 (Thomas, J., dissenting) (referring to, among other things, remarks made by tribal representatives during the negotiations which indicated an understanding that the reservation would be smaller as a result of the treaty)).

Regarding history subsequent to the passage of the Act, Petitioner contends that the Wyoming Supreme Court improperly accorded "great importance" to such history. (Hr'g Tr. 13:25–14:01.) To the contrary, the court clearly acknowledged, in its review of the governing precedent, the lesser degree of importance placed upon later events and circumstances and subsequently applied that precedent to this case. *Yellowbear*, 174 P.3d at 1280, 1282–84. Petitioner also points to subsequent legislation and government documents, including maps, that refer to the 1905 Act area as part of the reservation. (Doc. 125, Pet'r Resp. 17–18.) However, in support of the contrary conclusion, the Wyoming Supreme Court cited to other subsequent legislative history, Supreme Court opinions, a map, and the restoration in 1944 of certain ceded lands to the Reservation. *Yellowbear*, 174 P.3d at 1283–84. As the Supreme Court noted in *Hagen* and *Yankton*, inconsistencies in congressional reference to and treatment of the lands at issue reinforce the observation that "the views of a subsequent Congress form a hazardous basis for inferring the intent of an

earlier one." *Hagen*, 510 U.S. at 420, 114 S.Ct. 958 (quoting *United States v. Philadelphia Nat. Bank*, 374 U.S. 321, 348–349, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963) (internal quotation marks omitted)); *Yankton*, 522 U.S. at 354–55, 118 S.Ct. 789 (same). The *Yankton* Court further noted:

> Likewise, the scores of administrative documents and maps marshaled by the parties to support or contradict diminishment have limited interpretive value. We need not linger over whether the many references to the Yankton Reservation in legislative and administrative materials utilized a convenient geographical description or reflected a considered jurisdictional statement. The mixed record we are presented with "reveals no consistent, or even dominant, approach to the territory in question," and it "carries but little force" in light of the strong textual and contemporaneous evidence of diminishment.

522 U.S. at 355–56, 118 S.Ct. 789. Thus, while the Wyoming Supreme Court did not discuss the various competing examples of subsequent legislation, administrative actions, or government maps proffered by Petitioner here,[11] its ultimate conclusion of diminishment is not objectively unreasonable as it properly acknowledged the weaker significance and afforded less weight to the evidence.

Petitioner also challenges the Wyoming Supreme Court's review of the subsequent history of treatment of the area by the relevant authorities. Petitioner asserts that the tribes undertake several governmental activities in the 1905 Act area, including the provision of tribal social ser-

---

**11.** Numerous exhibits were presented to the district court for consideration during the pretrial hearing on diminishment. It is clear that the parties there presented to the district court several conflicting exhibits, including several maps. (Doc. 10, Resp'ts' Mot. to Dismiss Apr. 6, 2006, Exh. 1, Excerpt from Tr. of

Mot. Hr'g Jan. 23, 2006, 28:11–32:03; 60:05–60:08.) On appeal, the *Yellowbear* court appears to have been provided with the transcript from this hearing for its review. (*See* Doc. 81, Resp. to Pet. for Writ, Append. Brief of Appellant May 7, 2007, 10, 31–32 (citing to the hearing on jurisdiction).)

vices in Riverton, the maintenance of roads and water systems, the existence of tribal oil and gas interests, tribal agricultural production, the provision of housing by the Northern Arapaho Tribe in a portion of Riverton, the policing by the B.I.A. Wind River Police Department of the Arapaho Ranch, and the existence of tribal grazing rights. (Doc. 125, Pet'r Resp. 19–20; Hr'g Tr. 16:16–17:06.) [12] However, the assertions are far too generalized and unsupported with regard to the history and status of each of the parcels referenced. As it stands, the Court cannot blindly accept without question that those parcels represent the larger 1905 Act area which is at issue here. As Petitioner noted at hearing, a jurisdictional checkerboard often exists in areas like the one at issue here, and the Court hesitates to accept such broad conclusions in such a context. The Yellowbear court may not have specifically referenced any of these activities in its opinion, but it did recite several other present circumstances that favor a finding of diminishment under Supreme Court law.[13] *Yellowbear,* 174 P.3d at 1283 (location of the seat of tribal government; present population of Riverton; and provision of services by the State and Riverton). However, in light of its findings with respect to the most controlling evidence of the express language and contemporary understanding of the treaty and act, the decision here is not an unreasonable application of clearly established federal law.

Under the doubly deferential standard, and even under the usual deferential standard, it simply cannot be said that "most reasonable jurists exercising their independent judgment would conclude the state court misapplied Supreme Court law." *Maynard,* 468 F.3d at 671. The Wyoming Supreme Court decision is not "at such tension with governing U.S. Supreme Court precedents, or so inadequately supported by the record, or so arbitrary as to be unreasonable." *Id.* Moreover, it would strain credulity to argue that the Wyoming Supreme Court decision was even "clearly erroneous," a finding which would still not permit this Court to grant the Petition.

## V. CONCLUSION

The Court is sensitive to the history of unequal bargaining power and unjust treatment often afforded Indian tribes in their dealings with federal and state governments. This is a consideration that must inform any direct judicial review in cases regarding diminishment. However, this Court is here limited to collateral review of such a decision. Petitioner invites the Court to do what it cannot. The Court cannot determine anew, independently of the Wyoming Supreme Court's analysis, whether or not the 1905 Act served to diminish the Reservation and thus served to remove the Indian country status of the 1905 Act area. After conducting the review permitted, the Court finds that the Wyoming Supreme Court properly took into consideration and applied the law as set forth by the United States Supreme

---

**12.** Petitioner's counsel also attempts to dispute the court's recitation of population statistics, namely that 92% of Riverton is non-Indian, *Yellowbear,* 174 P.3d at 1283, by arguing that his own personal experience walking down the street in Riverton demonstrates that one cannot say that Riverton is not Indian country. (Hr'g Tr. 14:02–14:14.) This is unpersuasive.

**13.** It should also be noted that the transcript from the trial court hearing on jurisdiction contains significant testimony on the subject of subsequent treatment of Riverton and the larger 1905 Act area. (Doc. 10, Resp'ts' Mot. to Dismiss Apr. 6, 2006, Exh. 1, Excerpt from Tr. of Mot. Hr'g Jan. 23, 2006, 71:24–128:16.) As noted earlier, this record appears to have been provided to the *Yellowbear* court for its review on appeal.

Court and came to a conclusion that is not objectively unreasonable.

Based on the foregoing analysis, the Court grants summary judgment in favor of Respondents. Accordingly, Petitioner's underlying Petition for Relief must be denied.

NOW, THEREFORE, IT IS HEREBY ORDERED:

1. That Petitioner's Motion for Summary Judgment on Petition for Relief Pursuant to 28 U.S.C. 2254 to Vacate, or Set Aside Conviction and Sentence is **DENIED**;

2. That Respondents' Cross–Motion for Summary Judgment is **GRANTED**; and

3. That Petitioner's Petition for Relief Pursuant to 28 U.S.C. § 2254 to Vacate, or Set Aside Conviction and Sentence is **DENIED.**